793 A.2d 515

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND,**

v.

**George Elmer SNYDER, Jr.**

Misc. Docket AG No. 9, Sept. Term, 2000.

Court of Appeals of Maryland.

March 7, 2002.

244

Melvin Hirshman, Bar Counsel and John C. Broderick, Asst. Bar Counsel for the Atty. Grievance Commission of Maryland, for Petitioner.

John R. Salvatore, Esquire, Hagerstown, for Respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, JJ.

BATTAGLIA, Judge.

█ The respondent, George Elmer Snyder, Jr. (hereinafter "Snyder"), was admitted to the bar of this Court on December 30, 1976. On May 16, 2000, the Attorney Grievance Commission, acting pursuant to Maryland Rule 16–709(a), filed a petition for disciplinary action against Snyder, charging numerous violations of the Maryland Rules of Professional Conduct ("MRPC"),[1] including MRPC 1.1 (Competence),[2] MRPC 1.3 (Diligence),[3] MRPC 1.4 (Communication),[4] MRPC

---

1. It appears that in its Petition for Disciplinary Action, Bar Counsel alleged that Snyder violated Rules 1.1, 1.3, 1.4, 1.5, 1.7(b) and (c), 1.8(a) and (b), 1.15, 1.16, 3.4 and 8.4(c) and (d) of the MRPC, as well as Rules BU4, BU7 and BU9. The hearing judge did not render any findings of fact or conclusions of law with regard to rules 1.8(b), 1.16 and 3.4 of the MRPC; thus we will not discuss those alleged violations in this opinion.

2. Rule 1.1 provides:
   A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

3. Rule 1.3 provides:

## 1.5 (Fees),[5] MRPC 1.7(b) and (c) (Conflict of interest),[6] MRPC

A lawyer shall act with reasonable diligence and promptness in representing a client.

4.  Rule 1.4 provides:
    (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
    (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

5.  Rule 1.5 provides:
    (a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
    (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
    (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
    (3) the fee customarily charged in the locality for similar legal services;
    (4) the amount involved and the results obtained;
    (5) the time limitations imposed by the client or by the circumstances;
    (6) the nature and length of the professional relationship with the client;
    (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
    (8) whether the fee is fixed or contingent.
    (b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.
    (c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. The terms of a contingent fee agreement shall be communicated to the client in writing. The communication shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.
    (d) A lawyer shall not enter into an arrangement for, charge, or collect:

1.8(a) (Conflict of interest: Prohibited transactions),[7] MRPC 1.15 (Safekeeping property),[8] MRPC 8.4(c) & (d) (Miscon-

(1) any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or custody of a child or upon the amount of alimony or support or property settlement, or upon the amount of an award pursuant to Sections 8–201 through 213 of Family Law Article, Annotated Code of Maryland; or (2) a contingent fee for representing a defendant in a criminal matter.

(e) A division of fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(2) the client is advised of and does not object to the participation of all the lawyers involved; and

(3) the total fee is reasonable.

6. Rule 1.7(b) provides:

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation.

(c) The consultation required by paragraphs (a) and (b) shall include explanation of the implications of the common representation and any limitations resulting from the lawyer's responsibilities to another, or from the lawyer's own interests, as well as the advantages and risks involved.

7. Rule 1.8(a) provides:

(a) A lawyer shall not enter into a business, financial or property transaction with a client unless:

(1) the transaction is fair and equitable to the client; and

(2) the client is advised to seek the advice of independent counsel in the transaction and is given a reasonable opportunity to do. so.

8. Rule 1.15 provides:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or

duct),[9] and former rules BU4 (Trust Account—Required Deposits),[10] BU7 (Commingling of Funds),[11] and BU9 (Prohibited

---

third person.  Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests.  If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

9.  Rule 8.4 provides in relevant part:

It is professional misconduct for a lawyer to:

* * *

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice; ...

10.  Former Rule BU4, which appears now as Rule 16–604 in substantially similar form, states:

Except as otherwise permitted by rule or other law, all funds including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution.  This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person.

11.  Former Rule BU7, which appears now as Rule 16–607 in substantially similar form, states:

a.  General Prohibition

An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule BU4 or permitted to be so deposited by section b. of this Rule.

b.  Exceptions

1.  An attorney or law firm may deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, and any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.

2.  An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or

Transactions).[12]  The charges involved · Snyder's representation of the Maryland Troopers Association (hereinafter "MTA") and Dixie Mill Work Co., Inc. (hereinafter "Dixie Mill Work"), and complainants Dade Royer (hereinafter "Royer"), Marah Gensink (hereinafter "Gensink"), and Dorothy Whipp (hereinafter "Whipp") over a period of time from the late 1980s until 1996.[13]  This Court referred the complaint to Judge Patrick L. Woodward of the Circuit Court for Montgomery County for a hearing to determine findings of fact and conclusions of law pursuant to Maryland Rule 16–709(b).

The hearing before Judge Woodward was held on November 20 21, 2000, with closing arguments on June 1, 2001.  Bar Counsel called as witnesses, Steve Kessell and David Grove (two of Snyder's former associates at Snyder & Poole, PA), Cynthia Miles (former bookkeeper at Snyder & Poole, PA), Dorothy Whipp (former client), Scott Schubel (opposing counsel in litigation against David Royer which was handled by Snyder), and John Reburn (investigator for the Attorney Grievance Commission), as well as Snyder as an adverse

---

potentially to the attorney or law firm.  The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.
3.   Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

**12.**   Rule BU9, which is now Rule 16–609 states:

An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or bearer.

**13.**   Bar Counsel's Petition for Disciplinary Action filed on May 16, 2000, charges respondent with violations of Maryland Rules BU4, BU7 and BU9, for Snyder's various acts and omissions which took place between 1989 and 1996.  These former rules governing attorney trust accounts were renumbered effective January 1, 1997, and are now found in Chapter 600 of the Title 16, Maryland Rules 16–601 through 16–618. Throughout the opinion, we will refer to the rules as BU4, BU7 and BU9.

witness. Snyder's defense to the action consisted of presenting his own testimony, and that of his ex-wife, Lori Snyder, who served in an administrative capacity at Snyder & Poole, P.A., and as principal administrator in Snyder's successor law firm, Snyder, Attorneys at Law. Judge Woodward found by clear and convincing evidence that Snyder's acts and omissions constituted violations of Rules 1.1, 1.3, 1.4, 1.5(a), 1.7(b) and (c), 1.8(a), 1.15(a), and 8.4(c) and (d) of the MRPC, and former Rules BU4, BU7, and BU9, all of which was alleged by the Attorney Grievance Commission.

The Attorney Grievance Commission took no exceptions to Judge Woodward's findings of fact and conclusions of law, and recommended Snyder's disbarment. Snyder took six exceptions to Judge Woodward's findings of fact. Respondent's exceptions were as follows:

1. As to Complaint of Dade Royer: the Petitioner failed to take adequate steps to secure Complainant's appearance at trial and it was error to allow his inquiry panel testimony to be introduced since the Court was unable to observe his demeanor, credibility and Respondent was unable to cross examine Complainant.

2. As to Marah Gensink: the Petitioner has never secured her testimony at any hearing in this matter and it is error to make any findings of fact against Respondent when he has been unable to have the opportunity to cross examine her and the Court has relied solely on "hearsay" evidence and testimony of Respondent.

3. As to Dorothy Whipp: there is no evidence to support the finding that Respondent wasn't prepared and no evidence was propounded that the fee charged was not reasonable and the advice given not appropriate, particularly in light of the ultimate disposition.

4. Respondent further asserts the Court should have found by clear and convincing evidence that fixed fee engagement agreements were the preferred means by which attorneys were to be retained and it was up to the attorney to direct how the fee was to be booked, if otherwise.

5. Respondent further contends the Court should have found by clear and convincing evidence that the Petitioner did not initiate "any" investigation or inquiry into the Grove/Kessell matters until 1996 and after prior disciplinary action against Respondent ..., resulted in a private reprimand and which emanated out of the same facts and issues from the collapse of the firm in 1992. The Petitioner's actions herein were tantamount to a "fishing" expedition, followed by a bundling of any and all complaints into this one action against him which was prejudicial and done for the purpose of "loading" up on the Respondent.

6. Respondent never "misappropriated" any funds of any client. The Respondent always adhered to fixed fee engagement retainers and they were deposited accordingly.

Turning now to the merits of the case, we will address, in turn, the separate complaints filed by Snyder's clients by setting forth Judge Woodward's findings of fact and conclusions of law, our discussion of the relevant law pertaining to the violations, and conclude with our decision as to the appropriate sanction for Snyder's professional misconduct.

## I. Standard of Review.

■■ As the Court of original and complete jurisdiction for attorney disciplinary proceedings in Maryland, we conduct an independent review of the record. *See Attorney Grievance Comm'n v. Garland,* 345 Md. 383, 392, 692 A.2d 465, 469 (1997). The hearing judge's findings of fact will be accepted unless we determine that they are clearly erroneous. *See Attorney Grievance Comm'n v. Sachse,* 345 Md. 578, 589, 693 A.2d 806, 811 (1997)(quoting *Attorney Grievance Comm'n v. Boyd,* 333 Md. 298, 303, 635 A.2d 382, 384 (1994)). This is so because the hearing judge is in the best position to evaluate the weight to be accorded to the live testimony and behavior of the witnesses in rendering his/her findings of fact and conclusions of law. *See Attorney Grievance Comm'n v. Webster,* 348 Md. 662, 675, 705 A.2d 1135, 1142 (1998). Based upon our independent review of the record in the case *sub judice,* and for the reasons set forth below, we conclude that

there exists clear and convincing evidence to support the hearing judge's findings of fact and conclusions of law.

## II.   Misconduct Related to Client Escrow Account

The trial court's consideration of the complaints of David Grove and Bar Counsel consisted of an examination of an allegation of misconduct arising out of Snyder's operating procedures at his firm concerning the treatment of client funds received by the firm as fixed fees or retainers for legal services.   The evidence presented showed that Snyder served as the managing partner at the law firm of Snyder & Poole, P.A. (hereinafter, "the Firm"), from January 1, 1989 until the Firm's dissolution on December 28, 1992.   The Firm's dissolution followed a year of cash flow problems and multiple resignations of associate attorneys.   Following dissolution of the Firm, Snyder opened his own law office and continued to practice law in a firm called "Snyder, Attorneys at Law."

In his capacity as managing partner at Snyder & Poole, Snyder handled the day-to-day operations of the Firm, established policies and had final authority with regard to the Firm's escrow account, and along with Lori Snyder, his wife at that time, developed administrative policies and operational procedures for the Firm. One of the Firm's operating policies consisted of a system whereby the advance fee payments of clients were deposited directly into the Firm's general operating account, unless the fee payment included court costs.   For the latter, the policy was to deposit the payment into the client trust account and immediately transfer the fee portion to the general account.   Thus, the fees were immediately paid out to the Firm's general operating account prior to being earned. The clients, however, were provided with invoices reflecting incremental deductions against the retainer based upon the hourly billings of the attorneys for work performed on behalf of the clients.   Snyder continued to employ these operating procedures at Snyder, Attorneys at Law.

On February 19, 1993, an involuntary Petition for Bankruptcy was filed by several banks against Snyder and his wife,

Lori. Accordingly, the couple's personal bank accounts were frozen. In the period from February 23, 1993 to March 9, 1993, Snyder took funds from his personal credit cards and line of credit advances and deposited them into the Snyder, Attorneys at Law client escrow account. Thereafter, Snyder and his wife withdrew the funds from the escrow account for themselves and others.

Contemporaneous with Snyder's laundering of personal funds through the client escrow account, Snyder deposited a check for fees and costs from client Madison Walters in the amount of $2,600 into the Snyder, Attorneys at Law escrow account. Walters's check, however, was returned due to insufficient funds within six days of its being deposited into the escrow account, and the escrow account was debited for the amount of the check. Despite his knowledge that Walters's check had been dishonored, Snyder disbursed $2,300 from the escrow account into his firm's operating account as the fee for Ms. Walters on March 23, 1993 and thereby created a $2,300 deficit in the firm's escrow account.

In March of 1993, Snyder also received shipments of a powdered drink supplement from Power Shack, for purposes wholly unrelated to his practice of law.[14] Snyder authorized payment for the Power Shack shipments from the firm's escrow account on more than one occasion, despite the fact that the escrow account contained no funds for that purpose. Thereafter, Snyder replenished the deductions he made from the escrow account for the shipment payments with funds received from a business that purchased the drink supplement from him.

The circuit court's findings regarding these transactions were as follows:

---

**14.** At this point in time, Snyder was re-selling the supplies he ordered from Power Shack. At some point near May of 1994, Snyder formed a corporation, Power Shack of Hagerstown, Inc., in furtherance of this independent business venture. Power Shack of Hagerstown, Inc. is the business which ultimately overtook ownership of Family Fitness, Inc., the fitness club business Snyder owned with his client, Dade Royer. *See* Section III, *infra.*

## A. Findings Based on Testimony of Steven Kessell

"Steven C. Kessell, Esquire, worked as an associate attorney for the Firm from its inception until approximately December 11, 1992. Mr. Kessell had entered into an employment agreement with the Firm whereby he would be paid forty percent (40%) of the first one hundred thousand dollars ($100,000) in fees he generated and forty-five percent (45%) of the amount generated above one hundred thousand dollars ($100,000).

"Mr. Kessell interviewed new clients and entered into fee arrangements with those clients on behalf of [t]he Firm. He also set the amount of retainers in cases to be charged on an hourly basis, received those retainers and directed that they be deposited to the trust account. It was the policy of the Firm to treat those advance fee payments as collected revenue for the purpose of determining Mr. Kessell's salary. Mr. Kessell testified that Madeline Friend, Helen Cain, James Metz, Mary Sue Weber, William McKenzie, Eugene Michels and Michael Wright were all hourly clients who paid retainers that should have been segregated and not charged against until actual services were rendered. The client ledger cards for Madeline Friend, Helen Cain and James Metz indicate that the retainers for those clients were deposited into the trust account at Mr. Kessell's direction and within a few days the fee amount was disbursed from the trust account to the Firm's general account.

"When Mr. Kessell left the Firm in December 1992, certain clients, including those clients referred to above, elected to have him take their cases with him and requested that the Firm return any unearned fees. Mr. Kessell received a letter dated February 3, 1993, from Lori Snyder providing a check in the amount of two thousand, six hundred twenty-two dollars ($2,622), representing a return of fees for certain clients who chose to have Mr. Kessell continue to represent them. The check enclosed in that letter was drawn on the Snyder, Attorneys at Law accounts payable account, not an escrow account. The check for two

thousand, six hundred twenty-two dollars ($2,622) represented sixty percent (60%) of the actual unearned fees to be refunded to the clients who continued with Mr. Kessell. The Firm had deducted forty percent (40%) because Mr. Kessell had been paid that percentage of those unearned fees when they were transferred to the operating account and treated as collected fees. Although he disputed the Firm's deduction of forty percent (40%) of the unearned fees due to be refunded to those clients, Mr. Kessell provided further services at no charge to the clients to make up the forty percent (40%) that was deducted."

## B.  Findings Based on Testimony of David Grove

"David M. Grove, Esquire, was employed by the Firm in March 1992. Mr. Grove entered into an employment agreement which provided that the first year he would be paid a salary of fifty-two thousand dollars ($52,000) and thereafter he would be compensated on the basis of forty percent (40%) of the first one hundred thousand dollars ($100,000) of collected gross revenues generated by him and forty-five percent (45%) of the gross collected revenues in excess of one hundred thousand dollars ($100,000). Mr. Grove interviewed new clients and entered into fee agreements with those clients on behalf of the Firm. Mr. Grove set the amount of retainers on cases to be charged on an hourly basis, received those retainers and turned them over to the office manager for deposit. Mr. Grove understood that the retainers on hourly cases would be deposited into an account separate from an operating account. Mr. Grove testified that Edward Flynn, Roma Haddaway, Leslie Marko and Maxie Wilburn were all hourly clients who paid retainers in advance of any work being performed on their cases. John Reburn, the Attorney Grievance Commission Investigator, testified that based upon his review of the Firm's escrow account records, none of those retainers were deposited into a firm escrow account. Mr. Reburn's review of the cash received and fees charged journal for the Frederick office of the Firm reflected receipt of the retainer

fees for Leslie Marko and Maxie Wilburn and deposit of those fees to the general operating account.

"Mr. Grove resigned on December 28, 1992, prior to his one year anniversary and was never paid on a percentage basis. When Mr. Grove left the Firm, certain clients, including those clients referred to above, elected to have him take their cases with him and requested the Firm return any unearned fees. [Snyder's] successor firm, Snyder, Attorneys at Law, withheld forty percent (40%) of the refunds due each of Mr. Grove's clients and forwarded the balance to Mr. Grove by check drawn on the accounts payable account despite the fact that Mr. Grove had never been paid on a percentage basis. Mr. Grove objected and eventually an agreement was reached whereby Mr. Grove would return the funds to Snyder, Attorneys at Law, and checks would be cut directly to the clients by [Snyder's] firm for the full amount of the refunds due. The funds returned by Mr. Grove were deposited into the Snyder, Attorneys at Law escrow account along with the forty percent (40%) withheld by the Firm. Refund checks were drawn on the Snyder, Attorneys at Law escrow account and sent to Mr. Grove's clients. A refund check in the amount of four hundred forty-nine dollars and fifty cents ($449.50) was sent to John Winpigler, one of Mr. Grove's clients. Mr. Winpigler's check was returned several times due to insufficient funds in the escrow account. Ultimately the Firm refunded Mr. Winpigler's fee from a non-escrow account."

### C. Findings Based on Testimony of Joseph Filsinger Concerning Snyder's Representation of Dixie Mill Work Co.

"On or about March 15, 1992, Dixie Mill Work Co., Inc., (hereinafter, "Dixie Mill Work"), through Joseph Filsinger,[15]

---

**15.** The testimony of Joseph Filsinger, entered into evidence at the November 20, 2000 hearing and relied upon by Judge Woodward, was Filsinger's testimony from the prior proceeding before the inquiry panel. The testimony was admitted pursuant to Maryland Rule 5–804(b) as testimony of an unavailable witness because Filsinger passed

retained [Snyder] regarding that company's financial problems. Mr. Filsinger testified that [Snyder] was given a retainer of three thousand dollars ($3,000) that was to be charged against on an hourly basis. [Snyder] deposited the three thousand dollars ($3,000) retainer to the Snyder & Poole, P.A. operating account on October 15, 1992. On or about December 10, 1992, [Snyder] was given a check for twelve thousand, five hundred dollars ($12,500), which represented an advance fee plus costs for a potential bankruptcy proceeding on behalf of Dixie Mill Work. Mr. Filsinger understood that the twelve thousand, five hundred dollars ($12,500) would be placed in an escrow account until a determination was made whether to file a Chapter 11 bankruptcy.

"On or about December 11, 1992, the twelve thousand, five hundred dollars ($12,500) was deposited into the Snyder & Poole escrow account. On that same day [Snyder] drew a check in the amount of twelve thousand dollars ($12,000) on the Snyder & Poole escrow account payable to Snyder & Poole, P.A., which check was deposited into the Snyder & Poole operating account. Dixie Mill work was able to work out its financial difficulties and determined it was not necessary to file for bankruptcy. On or about March 19, 1993, Joseph Filsinger, Chairman of the Board of Dixie Mill Work, wrote to [Snyder] requesting the return of the twelve thousand, five hundred dollars ($12,500) advance fee and costs as well as the return of any unearned portion of the initial three thousand dollar ($3,000) retainer. [Snyder] had spent the twelve thousand dollar ($12,000) advance fee and was unable to return those funds to Dixie Mill Work. [Snyder] repaid the twelve thousand, five-hundred dollars ($12,500), plus the unearned portion of the initial retainer, to Dixie Mill Work by monthly installments over the period July 1993 through October 1993."

---

away one year prior to the hearings, which were held in the Circuit Court for Montgomery County.

Based on the aforementioned testimony and evidence, the hearing judge concluded that Snyder violated Rules 1.15(a) and 8.4(c) and (d) of the MRPC and Maryland Rules BU4, BU7 and BU9 by virtue of the methods by which he handled his clients' advance fee payments and through his misuse of the client escrow account.

Snyder filed two exceptions with regard to his use of the client trust account. He asserts that the hearing judge should have found by clear and convincing evidence that fixed fee agreements were the preferred means by which attorneys were to be retained and that the discretion for handling the fees rested with the individual attorneys. Snyder also excepted to the hearing judge's finding that he misappropriated client funds. We conclude that the hearing judge's findings of fact and conclusions of law concerning Snyder's use of the trust account were not clearly erroneous. Accordingly, Snyder's exceptions are overruled.

We also find that Snyder violated Rules 1.15(a) and 8.4(c) and (d) of the MRPC and Rules BU7 and BU9 by commingling his personal funds with client funds in the escrow account, using the client escrow account to deliberately conceal personal assets from his creditors, and writing checks from the escrow account for his own personal purposes during the bankruptcy litigation. *See Attorney Grievance Comm'n v. Milliken,* 348 Md. 486, 517, 704 A.2d 1225, 1240 (1998). Snyder used the client escrow account as a repository for the personal assets he sought to conceal from his creditors during the pendency of his involuntary bankruptcy. When Snyder made the cash advances from his credit cards and deposited the funds in his client escrow account, he committed a fraud by improperly representing to his creditors and to the bankruptcy court that the funds were being held in the account for the benefit of a third party and thus, were outside of the bankruptcy proceedings. *See Webster,* 348 Md. at 677–78, 705 A.2d at 1142–43 (explaining, "when an account is designated an attorney trust account, inquiry into the source of the funds within the account is irrelevant. Use of the trust account for

personal purposes while still designated a trust account ... is prohibited"). Snyder's well-calculated attempt to conceal personal assets in conjunction with the bankruptcy proceedings resulted in the commingling of funds in violation of MRPC 1.15(a) and Rules BU7 and BU9. It also involved dishonesty, fraud, deceit, misrepresentation and conduct prejudicial to the administration of justice in violation of MRPC 8.4(c) and (d). *See Attorney Grievance Comm'n v. Bernstein*, 363 Md. 208, 229, 768 A.2d 607, 618 (2001)(finding that the attorney "willfully misappropriated funds from his client trust account and commingled his personal funds with those of his clients" resulting in his disbarment); *Attorney Grievance Comm'n v. Hess*, 352 Md. 438, 448, 722 A.2d 905, 910 (1999)(violation of MRPC 8.4(c) where attorney intentionally and repeatedly inflated billing with regard to one particular client); *Attorney Grievance Comm'n v. Bailey*, 286 Md. 630, 635–36, 408 A.2d 1330, 1333 (1979)(stating that if the evidence had shown that Bailey intended "to steal or consciously misappropriate funds," the Court would have disbarred him).

Finally, the client escrow account served as a conduit for Snyder's outside business venture with Power Shack. By writing unauthorized checks from the escrow account to pay for his shipments of Power Shack drink supplements, Snyder violated Rule BU9.

The parties never argued any issues regarding Snyder's fourth exception as it relates to violations of Rule BU4 and BU7, concerning the depositing and holding of client funds in trust accounts. Furthermore, the sanction against Snyder remains the same regardless of whether we overrule or sustain his fourth exception. *See Hess*, 352 Md. at 450, 722 A.2d at 911(explaining that consideration of cumulative violations "serves no useful purpose" since it would not bear on the attorney's other violations and would not affect the sanction to be imposed); *Attorney Grievance Comm'n v. Eisenstein*, 333 Md. 464, 484, 635 A.2d 1327, 1336 (1994)(finding that consideration of overlapping violations "does not measurably add to the seriousness of the conduct for purposes of considering the

appropriate sanction"). Therefore, we elect not to address Snyder's fourth exception.

### III. Conflict of Interest Violations

Due to the similarity of violations involved in Snyder's representations of Dade Royer and the Maryland Troopers Association, we will address these issues together. With regard to Snyder's long-standing representation of Dade Royer, a client relationship which developed while Snyder worked at Snyder & Poole, P.A. and which went sour during Snyder's representation of Royer in his subsequent legal practice following dissolution of the Firm, Judge Woodward found:

"[Snyder] initially represented Mr. Royer in the 1980's for the purpose of incorporating American Fitness, Inc., which did business as Fitness Works, a fitness club in Hagerstown. Thereafter, [Snyder's] firm represented Mr. Royer and his corporation regarding collections work and bonding issues with the State of Maryland. In early 1992, Mr. Royer sought [Snyder's] advice regarding his financial difficulties and the possibility of filing for bankruptcy and paid [Snyder] a fee. After his discussions with [Snyder], Mr. Royer began operating under a different corporate name instead of filing for bankruptcy. Mr. Royer moved his fitness club to a new location and the landlord at the old location, Northern International Associates (hereinafter, "Northern"), obtained a judgment in the Circuit Court for Washington County against Mr. Royer and his corporation, American Fitness, Inc., for unpaid rent.

"In early 1993, due to continuing financial difficulties, Mr. Royer decided to close the fitness club and again sought [Snyder's] advice regarding bankruptcy. [Snyder] suggested that, instead of filing for bankruptcy, Mr. Royer and [Snyder] form a new corporation and open a fitness club in a new location. [Snyder] formed a corporation, Family Fitness, Inc., on or about April 2, 1993 with forty percent (40%) of the stock going to Mr. Royer, as trustee for his children and forty percent (40%) going to [Snyder], as trustee for his children. The remaining twenty percent (20%) would be

non-voting shares to be sold to investors for one thousand dollars ($1,000) per share. Mr. Royer viewed [Snyder] as his attorney and relied on him in the business transaction the same as he did in the legal representation. [Snyder] did not advise Mr. Royer to seek the advice of independent counsel regarding this business transaction. [Snyder] testified that he told Mr. Royer he should have the agreement reviewed by separate counsel and suggested the name of Mike Thoms. Mr. Royer denied this and indicated Mike Thoms was an attorney in Pennsylvania with whom he was friendly and had consulted on some matter which he couldn't recall.

"[Snyder] continued to represent Mr. Royer with respect to Northern's attempt to collect on its judgment despite the fact that conflicts developed between [Snyder] and Mr. Royer over their business endeavor. In early 1994, [Snyder] indicated in correspondence to Mr. Royer his dissatisfaction in Mr. Royer's management of the fitness club and the desire of the shareholders that Mr. Royer turn in his shares. While representing Mr. Royer, but without consulting him, [Snyder] attempted to negotiate a settlement with Northern's attorney whereby [Snyder] or another investor would pay to settle the lawsuit in return for Mr. Royer signing over his shares of stock in Family Fitness, Inc. to [Snyder]. On April 28, 1994, [Snyder] wrote to Mr. Royer and Northern's attorney advising that he did not represent the interest of Mr. Royer individually in the Northern matter. The letter to Mr. Royer was copied to Steve Pearl, one of the other shareholders in Family Fitness, Inc.

"In March 1994, [Snyder] formed a new corporation, Powershack, Inc. He filed Articles of Amendment on or about May 23, 1994, that changed the name to Powershack of Hagerstown, Inc. This corporation took over the Family Fitness operation and effectively forced Mr. Royer out of the business."

Judge Woodward made the following findings of fact with respect to Snyder's relationship with the MTA:

"On or about February 22, 1990, the Firm [Snyder & Poole, PA] was retained by the Maryland Troopers Association (hereinafter, "MTA") to represent that association and its members. Beginning in 1991, [Snyder] also offered a prepaid legal services plan and MTA agreed to pay [Snyder] twenty dollars ($20) per member per year for its members to receive discounted legal services. Individual members could elect to pay an additional eighty dollars ($80) a year to receive a fully prepaid legal services plan.

"In 1992, MTA purchased two units of interest in a video produced by Snyder Marketing Group, Inc., a business venture controlled and substantially owned by [Snyder], at a cost of five thousand dollars ($5,000) per unit. At a meeting of MTA's Executive Board on February 18, 1992, [Snyder] advised that this was a no risk investment because if MTA failed to recoup its investment within one year, [Snyder] would refund the money. [Snyder] represented that it was urgent that MTA decide that night whether to make the investment and did not advise MTA to seek the advice of independent counsel before making that decision. MTA did not recoup its investment and neither [Snyder] nor Snyder Marketing Group, Inc., returned any funds despite the request of MTA that he do so. On or about February 5, 1993, [Snyder's] successor law firm, Snyder, Attorneys at Law, was discharged by MTA."

■ Respondent argues that the hearing judge improperly admitted into evidence Royer's testimony from the inquiry panel hearing and adopted this testimony in rendering the findings of fact and conclusions of law. Judge Woodward admitted Royer's testimony from the October 21, 1998 inquiry panel hearing pursuant to Maryland Rule 5–804(a), which states:

(a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant:

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement;

(2) refuses to testify concerning the subject matter of the declarant's statement despite an order of the court to do so;
(3) testifies to a lack of memory of the subject matter of the declarant's statement;
(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or
(5) is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subsection (b)(2), (3), or (4) of this Rule, the declarant's attendance or testimony) by process or other reasonable means.

At the time of the hearing in the Circuit Court for Montgomery County, Royer no longer lived in Maryland and was not subject to subpoena. *See Bartell v. Bartell*, 278 Md. 12, 19, 357 A.2d 343, 347 (1976)(stating that "the subpoena powers of the State of Maryland stop at the state line"). Furthermore, efforts by Bar Counsel to contact Royer by telephone and mail to procure his appearance at the hearing before Judge Woodward proved unsuccessful. Royer was absent at the hearing in the Circuit Court for Montgomery County and his presence could not be procured by process. Thus, respondent's exception to the admission in evidence of Royer's inquiry panel testimony is overruled.

With respect to his representation of clients Royer and the MTA, the hearing judge concluded by clear and convincing evidence that Snyder violated Rules 1.7(b) and (c) and 1.8(a) of the MRPC based upon Snyder's participation in personal business transactions with his clients while continuing to provide them with legal representation.

In *Attorney Grievance Comm'n v. Korotki*, 318 Md. 646, 569 A.2d 1224 (1990), we explained:

... to sustain a transaction of advantage to himself with his client, the attorney has the burden of showing, not only that he used no undue influence, but that he gave his client all the information and advice which it would have been his

duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been had the client dealt with a stranger.

*Id.* at 666, 569 A.2d at 1234 (quoting *Etzel v. Duncan,* 112 Md. 346, 350–51, 76 A. 493, 495 (1910)). In his dealings with both Royer and MTA, Snyder engaged in self-dealing in violation of MRPC 1.7(b) and (c) and failed to advise his clients that they should seek the advice of independent counsel in violation of MRPC 1.8(a). *See Attorney Grievance Comm'n v. Johnson,* 363 Md. 598, 618–20, 770 A.2d 130, 142–44 (2001)(finding a clear conflict of interest where attorney simultaneously represented clients in connection with a mortgage foreclosure and entered into a contract of sale to purchase the clients' home for himself).

## IV. Competence, Diligence, Communication, and Excessive Fees

Judge Woodward found the following concerning Snyder's representation of Marah Gensink in 1994 when he was practicing on his own:

"In or about August 1994, Ms. Gensink was charged in Allegany County with driving while intoxicated and other motor vehicle violations. Later that month, she was charged with harassment and telephone misuse in the District Court for Washington County. On or about August 28, 1994, Ms. Gensink was admitted to the Washington County Hospital for mental health reasons in connection with a fire in her residence. She was subsequently charged with arson in Washington County District Court on or about September, 1994. Ms. Gensink was transferred from Washington County Hospital to Taylor Manor Hospital and then to the Finan Center where she remained until February 14, 1995.

"After being contacted by Ms. Gensink for legal representation, [Snyder] prepared a letter for Ms. Gensink's signature dated August 30, 1994, requesting the redemption of nine thousand dollars ($9,000) from her retirement account in order to pay seven thousand, five hundred dollars ($7,500) to [Snyder] for his fee. [Snyder] received those funds. On

or about September 19, 1994, [Snyder] entered his appearance on behalf of Ms. Gensink in the District Court for Allegany County regarding the DWI charges and filed a Motion for Continuance based on her psychiatric commitment. On September 28, 1994, Ms. Gensink and [Snyder] entered into a written fee agreement providing that for a flat fee of seventy-five hundred dollars ($7,500) [Snyder] would represent Ms. Gensink in connection with 'pending criminal and DWI charges; preparation of Power of Attorneys; issues arising out of psychiatric commitment; arson investigation; coordination of mail, payment of bills, and depositing of pension and disability check with family, banking officials and creditors.' This agreement did not limit the representation in the DWI matter to the District Court.

"Ms. Gensink also signed a letter prepared by [Snyder] dated September 17, 1994, requesting to redeem thirty thousand dollars ($30,000) from her retirement account in order to net twenty-four thousand dollars ($24,000) for [Snyder's] fee. [Snyder] received those funds. [Snyder] and Ms. Gensink entered into another written fee agreement dated September 28, 1994, providing that for a flat fee of twenty thousand dollars ($20,000) [Snyder] would represent Ms. Gensink 'in connection with pending felony arson charges, plea of not criminally responsible, Motion for Mental Examination, and defense of charges.' [Snyder] held the balance of four thousand dollars ($4,000) on behalf of Ms. Gensink.

"On or about November 10, 1994, [Snyder] wrote to Ms. Gensink advising that he would request a jury trial in the Allegany County case and that his retainer for the Circuit Court would be fifteen hundred dollars ($1,500). Notwithstanding the flat fee agreement entered into on September 28, 1994, on that same day [Snyder] disbursed the additional fifteen hundred dollars ($1,500) to himself from Ms. Gensink's funds.

"After Ms. Gensink's discharge from the Finan Center, [Snyder] entered his appearance in the arson case in the District Court for Washington County on February 15, 1995

and requested a preliminary hearing. [Snyder] and Ms. Gensink appeared at the preliminary hearing on the arson charges in the District Court for Washington County on March 29, 1995 and the charges were dismissed for lack of probable cause. [Snyder] did not return any unearned portion of the twenty thousand dollar ($20,000) fee he collected for the arson case although he did not perform a substantial portion of the work contemplated by the fee agreement. Although [Snyder] contends that the twenty thousand dollar ($20,000) fee covered the arson investigation and his efforts to prevent charges being brought, the arson investigation was clearly covered by the seventy-five hundred ($7,500) dollar flat fee agreement.

"[Snyder] requested a jury trial in the DWI case in Allegany County on February 27, 1995, and a summons was issued to Ms. Gensink setting the initial appearance in that case for March 27, 1995. The summons clearly stated that failure to appear personally on that date could result in arrest.

"On or about March 17, 1995, [Snyder] sent to Ms. Gensink a copy of his entry of appearance and advised her that it would not be necessary for her to appear for the initial appearance. [Snyder] and Ms. Gensink did not appear for the initial appearance on the DWI charges and a body attachment was issued for Ms. Gensink for failure to appear. [Snyder] learned of the outstanding body attachment in a conversation with the State's Attorney. [Snyder] failed to take steps to have the warrant recalled because the State's Attorney had indicated that when a plea date was set, the warrant would be withdrawn. [Snyder] assumed that such withdrawal would probably occur before the warrant's service, because the warrant was issued in Allegany County and Ms. Gensink was in Washington County. On or about April 27, 1995, Ms. Gensink was arrested on the body attachment in the DWI case and incarcerated at the detention center in Cumberland, Maryland. The following day after spending the night in the detention center Ms. Gen-

sink appeared, without counsel, for her bond hearing and was released on her own recognizance.

"On or about May 24, 1995, [Snyder] and Ms. Gensink appeared for trial in the Circuit Court for Allegany County on the DWI charges and Ms. Gensink entered a plea of guilty to driving while intoxicated. The State entered a *nolle prosequi* to the other charges and Ms. Gensink received a sentence of six (6) months that was suspended and three (3) years supervised probation."

The hearing judge concluded by clear and convincing evidence that Snyder violated Rules 1.1, 1.3, 1.4, 1.5(a), and 8.4(d) of the MRPC in his representation of Gensink.

■ Snyder argues in his second exception to the hearing judge's findings of fact and conclusions of law that Judge Woodward erred in rendering findings of fact against him in the absence of live testimony from Gensink. In his exception, however, respondent notes that his own testimony helped to form the basis of the hearing judge's findings of fact and conclusions of law. In light of the documentary evidence (totaling one-hundred and eighteen documents) admitted at the hearing, which included correspondence and records relating to Snyder's representation of Gensink, and Snyder's *own* testimony concerning his representation, we conclude that the hearing judge's findings of fact and conclusion that Snyder violated Rules 1.1, 1.3, 1.4, 1.5(a), and 8.4(d) were supported by clear and convincing evidence.

MRPC 1.1 requires that a lawyer provide competent representation to his clients. As we explained in *Attorney Grievance Comm'n v. Manning,* 318 Md. 697, 569 A.2d 1250 (1990):

In recent years ... we have noticed too many instances when lawyers have agreed to represent clients and accepted fees, in part or in whole, only to completely neglect these same legal problems, causing the same clients emotional distress, financial loss, or other varying kinds of inconvenience ... this kind of persistent conduct is evidence of a lawyer's disregard of his obligation.

*Id.* at 704–05, 569 A.2d at 1254. We have explained the importance of MRPC 1.1 by stating that "[t]he requirement of adequate preparation has long been recognized as part of a lawyer's responsibility to provide competent representation, and it is not without significance that, in the current Code of Professional Responsibility embodied in the [MRPC], the duty to provide competent representation is given 'the place of honor as the first ingredient in the lawyer-client relationship.' " *Attorney Grievance Comm'n v. Ficker*, 349 Md. 13, 39–40, 706 A.2d 1045, 1057–58 (*Ficker II* ) (1998)(quoting 1 GEOFFREY C. HAZARD, JR. AND W. WILLIAM HODES, THE LAW OF LAWYERING, 2d ed. § 1.1:101 (1997)).

At the time Snyder undertook his representation of Marah Gensink, he was well aware of those mental health issues which were linked to some of the matters for which legal representation was sought. Snyder's irresponsibility and lack of diligence in failing to research whether Gensink needed to be present at the initial appearance before the court in Allegany County, and his subsequent failure to have the warrant for Gensink's arrest recalled once he learned of its issuance, provides sufficient evidence that Snyder did not have the "legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." MRPC 1.1. As a consequence of Snyder's misfeasance, his client was arrested, spent the night at the detention center, and appeared without representation for her bond hearing.

█ The hearing judge also appropriately concluded that Snyder violated MRPC 1.3 in his representation of Gensink. MRPC 1.3 requires lawyers to act "with reasonable diligence and promptness" in the representation of their clients. The initial appearance in Gensink's DWI case, for which Snyder failed to appear and advised his client that she did not need to appear, took place on March 27, 1995. Although several weeks elapsed between the issuance of the body attachment for Gensink, and her eventual arrest on April 27, 1995, Snyder failed to act in a timely manner to prevent the arrest and remedy the situation—in fact, he did nothing at all.

■ Snyder also violated MRPC 1.4 in his representation of Gensink by failing to explain to her the circumstances and legal implications of her DWI case in Allegany County in order to enable her to make informed decisions concerning Snyder's representation of her in that case. Snyder improperly advised Gensink that she did not need to appear in court for the initial appearance. Based on this information, Gensink did not appear and was arrested. Without a sufficient explanation from Snyder concerning the relevant law and procedure as required by MRPC 1.4, Snyder deprived Gensink of the ability to make an informed decision about her case. *See Attorney Grievance Comm'n v. Cassidy,* 362 Md. 689, 698, 766 A.2d 632, 637 (2001).

Snyder's sixth exception vaguely asserts that he "never 'misappropriated' any funds of any client" and that he "always adhered to fixed fee engagement retainers" which he "deposited accordingly." Snyder has failed to present us with an exception appropriately challenging Judge Woodward's findings of fact and conclusion that he violated Rule 1.5(a). Snyder has not convinced this Court that the trial judge's finding of unreasonableness was clearly erroneous. Thus, we agree with Judge Woodward's conclusion that Snyder violated Rule 1.5(a) in his representation of Marah Gensink.

■ Additionally, we agree with Judge Woodward's conclusion that Snyder's failure to appear at the initial appearance on behalf of Gensink, and his failure to be present at the bond hearing following Gensink's incarceration constitute conduct which is "prejudicial to the administration of justice" in violation of MRPC 8.4(d). *See Attorney Grievance Comm'n v. Ficker,* 319 Md. 305, 315, 572 A.2d 501, 505–06 (1990)(*Ficker I* ); *Attorney Grievance Comm'n v. Howard,* 282 Md. 515, 523, 385 A.2d 1191, 1196 (1978).

■ Judge Woodward set forth the following findings of fact concerning Snyder's representation of Dorothy Whipp, which took place in 1996:

"Dorothy Whipp consulted [Snyder] regarding a charge of failure to remain at the scene of a bodily injury accident and

related charges. [Snyder] agreed to represent Ms. Whipp regarding those charges for a fee of twenty-five hundred dollars ($2,500), which fee Ms. Whipp paid the day of her consultation with [Snyder]. There was no written retainer agreement. Ms. Whipp testified that she made several calls over the next two months but did not hear from [Snyder] again until several days before the trial when he advised her to meet him at his office the morning of the trial. [Snyder] testified that prior to the District Court trial date, he spoke to the Deputy and was satisfied that he had "no axe to grind in the case." On the day of the District Court trial, Ms. Whipp, along with her daughter and son, met [Snyder] at his office and walked over to the court. [Snyder] did not discuss the case with Ms. Whipp prior to walking over to court.

"[Snyder] did not inquire into the background of the complaining witness or investigate whether he had any treatment for the alleged injury sustained in the incident prior to the District Court trial date. [Snyder] did not talk with the prosecutor, police officer and the complaining witness until immediately before trial was scheduled to begin. On the day of trial, [Snyder] advised Ms. Whipp that, in view of her emotional state, if they tried the case that day in front of the presiding judge, she ran the risk of conviction and he recommended that they pray a jury trial. According to Ms. Whipp, on the day of trial the only items in [Snyder's] file for her case were a picture of the complaining witness, the traffic citations, and Ms. Whipp's personal information.

"[Snyder] requested an additional fee of fifteen hundred dollars ($1,500) to represent Ms. Whipp in the Circuit Court. Ms. Whipp gave [Snyder] a check for fifteen hundred dollars ($1,500) that day. After leaving court, Ms. Whipp had second thoughts and stopped payment on the check. Ms. Whipp retained new counsel who requested a refund from [Snyder] of the unused portion of the twenty-five hundred dollar ($2,500) fee and [Snyder] returned one thousand dollars ($1,000) to Ms. Whipp."

The court concluded by clear and convincing evidence that Snyder violated Rules 1.3 and 1.5(a) of the MRPC in his representation of Whipp.

We find no merit in Snyder's contention that the hearing judge erroneously concluded that Snyder was ill-prepared and overcharged his client in his representation of Dorothy Whipp. Rather, we conclude that the record demonstrates by clear and convincing evidence that Snyder violated MRPC 1.3 and 1.5(a) in his representation of Whipp.

Despite his protestations to the contrary, the record indicates that Snyder was not prepared for the trial of Ms. Whipp's case. *See Attorney Grievance Comm'n v. Harrington,* 367 Md. 36, 49–51, 785 A.2d 1260, 1267–68 (2001)(sustaining the hearing judge's conclusion of law that an attorney violated MRPC 1.3 by failing to diligently pursue the legal representation of three separate clients as evidenced by his lack of action on their cases and failure to respond to client inquiries and otherwise communicate with clients concerning their cases). Thus, by neglecting his responsibilities to Whipp in failing to diligently represent her interests, Snyder violated MRPC 1.3. *See Attorney Grievance Comm'n v. Chasnoff,* 366 Md. 250, 267–68, 783 A.2d 224, 234 (2001); *Milliken,* 348 Md. at 516, 704 A.2d at 1240.

With regard to Snyder's argument that he did not overcharge Whipp for the services he rendered, we find that Judge Woodward's findings of fact and conclusions of law that Snyder violated Rule 1.5(a) were supported by clear and convincing evidence.

Lastly, Snyder argues that the AGC was on a "fishing" expedition, which would make the AGC's action against him somehow prejudicial or unfounded. The generality of Snyder's fifth exception fails to provide a cogent challenge to Judge Woodward's findings of fact and conclusions of law. *See Attorney Grievance Comm'n v. Shaw,* 363 Md. 1, 12, 766 A.2d 1028, 1033–34 (2001)(*Shaw II* ).

■ We also note that Snyder has asked the Court to consider laches as a mitigating factor. Although the investigation of and subsequent proceedings in this case began in 1993, the delays in moving the case forward are attributable to the volume of business records which needed to be reviewed, and a delay in obtaining access to some of the records which were being reviewed by other authorities in conjunction with a separate investigation. Nevertheless, we decline to apply the doctrine of latches as a basis to dismiss this matter or to serve as a mitigating factor in our sanctioning of Snyder, "[b]ecause the purpose of disciplinary action against an attorney is to protect the public [such that] dismissal of the disciplinary petition for the sole reason that the Attorney Grievance Commission failed to proceed with the proper dispatch is manifestly unwarranted." *Attorney Grievance Comm'n v. Kahn,* 290 Md. 654, 684, 431 A.2d 1336, 1352 (1981).

## V. Sanction

■ Snyder's exceptions having been overruled, we must now consider the appropriate sanction for Snyder's egregious misconduct. The Attorney Grievance Commission is seeking disbarment, while Snyder's counsel has advocated a reprimand, arguing that Snyder's acts were "trivial, technical violations of the rules." We evaluate every attorney grievance matter separately, taking into account the facts and circumstances involved. *See Attorney Grievance Comm'n v. Powell,* 328 Md. 276, 300, 614 A.2d 102, 114 (1992)(quoting *Attorney Grievance Comm'n v. Kemp,* 303 Md. 664, 680, 496 A.2d 672, 680 (1985)). Disciplinary hearings for attorney misconduct are not meant to serve a punitive purpose. *See Attorney Grievance Comm'n v. Fezell,* 361 Md. 234, 254, 760 A.2d 1108, 1118 (2000); *Webster,* 348 Md. at 678, 705 A.2d at 1143. Instead, attorney disciplinary proceedings are designed to protect the public, promote reliability and veracity in the legal profession and to deter other attorneys from committing violations of the MRPC. *See Attorney Grievance Comm'n v. Franz & Lipowitz,* 355 Md. 752, 760–61, 736 A.2d 339, 343

(1999); *Attorney Grievance Comm'n v. Myers,* 333 Md. 440, 447, 635 A.2d 1315, 1318 (1994).

An earlier grievance had been filed against Snyder, in which Snyder was charged with not paying certain taxes which were due and owing, and for violating MRPC 8.4(c) and (d) by failing to pay over 401K contributions which had been withheld from employee salaries within 90 days of the deductions as required by law. As a result of this prior complaint, Snyder received a private reprimand. Unfortunately, it appears as though the earlier reprimand and admonition failed to serve its purpose, for Snyder's errant conduct did not diminish and the public has suffered as a consequence. *See Attorney Grievance Comm'n v. Kerpelman,* 323 Md. 136, 150, 591 A.2d 516, 523–24 (1991).

At oral argument, Snyder's counsel argued that the client complaints at issue in this matter occurred as a result of the breakup of Snyder & Poole, PA, due to "sour grapes" and jealousy. Specifically, counsel argued:

> ... [Snyder's] an innovator. He's a marketer. When the practice of law was allowed to advertise, that is, be marketed, he was one of the first ones, and the most successful of ones in our part of the state to market the services of his law firm. And he's been very successful at that. And of course, he's incurred a lot of professional jealousy as a result. He's been a member of the bar for 25 years. I've known him the whole time. I even hired him as an Assistant State's Attorney and am very satisfied with his work with me. I've always found him to be honest. I've always found him to be competent. I've always found him to be kind. Despite complaints that have been brought against him and despite the breakup of the law firm, I have not heard him utter an unkind word about his former partner, or partners or attorneys or people who have brought complaints. He's not vindictive and I would ask that in light of [his] good history—his competence and the fact that what I regard—you may take exception—most of these complaints to be trivial, technical violations of the rules....

Contrary to this disingenuous assertion, Snyder's conduct effects an egregious pattern of self-dealing.

The severity of the sanction to be applied is measured by the egregiousness of the misconduct under the particular facts and circumstances of the case. *See Attorney Grievance Comm'n v. Briscoe*, 357 Md. 554, 568, 745 A.2d 1037, 1044 (2000)(quoting *Milliken*, 348 Md. at 519, 704 A.2d at 1241)(noting "[t]he gravity of misconduct is not measured solely by the number of rules broken but is determined largely by the lawyer's conduct"); *Attorney Grievance Comm'n v. Montgomery*, 318 Md. 154, 165, 567 A.2d 112, 117 (1989). Snyder's misconduct infected every nook and cranny of his legal practice. His dishonest and deceitful conduct with regard to the misuse of his client escrow account alone would be sufficient to warrant a sanction of disbarment. *See Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 418, 773 A.2d 463, 488 (2001). It is outrageous and offensive to this Court, the members in good standing of the bar of this State, and the public that Snyder would attempt to minimize the gravity of his misconduct by calling it "trivial, technical violations of the rules." Snyder's unapologetic and irreverent behavior reflects his inability to mend his ways and conform his conduct to the ethical rules governing the practice of law in Maryland. Accordingly, Snyder is hereby disbarred.

*IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–515(C) FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST GEORGE E. SNYDER, JR.*