The PEOPLE of the State of
Colorado, Complainant

v.

Norman B. BEECHER, Respondent.

No. 13PDJ063.

Office of the Presiding Disciplinary Judge
of the Supreme Court of Colorado.

April 21, 2014.

Following a disciplinary hearing, a hearing board suspended Norman B. Beecher (Attorney Registration Number 12722) for six months, with the requirement that he petition for reinstatement. To be reinstated, Beecher will bear the burden of proving by clear and convincing evidence that he has been rehabilitated, has complied with all disciplinary orders and rules, and is fit to practice law. The Colorado Supreme Court affirmed the hearing board's decision on May 18, 2015. Beecher's suspension takes effect on July 1, 2015.

Beecher advised his client, a criminal defendant, not to attend a pretrial conference when he discovered that her ex-husband, whom he believed was dangerous and violent, would be attending the conference. Disregarding all available information to the contrary, Beecher assured his client that he would obtain a continuance and informed her that she need not appear. Although he failed to obtain a continuance, Beecher refused to attend the pretrial conference himself. As a result, a bench warrant issued for his client's arrest. Beecher then delayed taking appropriate action to quash the warrant or resolve the situation, and he failed to secure his client's appearance at a subsequent hearing.

Beecher's incompetent advice to his client, coupled with his failure to attend the pretrial conference and his mishandling of the consequences of those decisions, violated Colo. RPC 1.1 (a lawyer shall provide competent representation to a client) and Colo. RPC 8.4(d) (a lawyer shall not engage in conduct prejudicial to the administration of justice). Taking into account the totality of the circumstances, with special consideration of Beecher's prior disciplinary history, the hearing board concluded that Beecher should be suspended for six months, with the requirement that he petition for reinstatement under C.R.C.P. 251.29(c).

On February 11 and 12, 2014, a Hearing Board comprised of Patrick J. McCarville and Frederick Y. Yu, members of the bar, and WILLIAM R. LUCERO, the Presiding Disciplinary Judge ("the PDJ"), held a hearing pursuant to C.R.C.P. 251.18. Geanne R. Moroye appeared on behalf of the Office of Attorney Regulation Counsel ("the People"), and Norman B. Beecher ("Respondent") appeared pro se. The Hearing Board now issues the following "Opinion and Decision Imposing Sanctions Pursuant to C.R.C.P. 251.19(b)."

## OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)

### I. SUMMARY

Respondent advised his client, a criminal defendant, not to attend a pretrial conference when he discovered that her ex-husband, whom he believed was dangerous and violent, would be attending the conference. Disregarding all available information to the contrary, he assured his client that he would obtain a continuance and informed her that she need not appear. Although he failed to obtain a continuance, Respondent refused to attend the pretrial conference himself. As a result, a bench warrant issued for his client's arrest. Respondent then delayed in taking appropriate action to quash the warrant or resolve the situation, and he failed to secure his client's appearance at a subsequent hearing. Taking into account the totality of the circumstances, with special consideration of Respondent's prior disciplinary history, the

Hearing Board concludes that Respondent should be suspended for six months, with the requirement that he petition for reinstatement.

### II. PROCEDURAL HISTORY

The People filed a complaint in this case on July 31, 2013, bringing claims premised on violations of Colo. RPC 1.1 (competence), 1.2(d) (counseling criminal behavior), and 8.4(d) (prejudicing the administration of justice). Respondent was granted an extension of time to respond, and he filed his answer on September 24, 2013. During an at-issue conference on October 7, 2013, the PDJ set the disciplinary hearing for February 11–13, 2014. On December 16, 2013, Respondent moved to continue the trial date; the PDJ denied the motion. On December 27, 2013, Respondent sought reconsideration of the PDJ's order; the PDJ also denied that motion. During the parties' pretrial conference on January 23, 2014, Respondent orally renewed his motion to continue the trial, but the PDJ denied that request. He then filed a written motion requesting the same relief on January 30, 2014. That, too, was denied.

On December 17, 2013, the People moved for summary judgment on all three claims pleaded in their complaint. The People then filed a "Notice of Non–Opposition" on January 6, 2014, asking the PDJ to deem their motion confessed pursuant to C.R.C.P. 121 section 1–15(3) and to grant summary judgment in their favor. On January 8, 2014, eight days after his response was due, Respondent moved for additional time to respond. The PDJ declined to grant Respondent an enlargement of time, but he considered the People's motion on the merits, rather than deeming their motion confessed. The next day, the PDJ denied the People's motion for summary judgment.

The District Attorney for the Eighteenth Judicial District, a third party, moved on January 7, 2014, to partially quash or modify a subpoena that Respondent had served on him. Following a status conference concerning the matter on January 9, 2014, the PDJ granted the motion and quashed the subpoena to the extent that it called for the produc-

tion of materials protected by the attorney work-product doctrine.

On January 27, 2014, Respondent moved for additional time to file his pretrial materials or, alternatively, for sanctions. The next day, the People filed a response and Respondent filed a reply without leave of court. The PDJ denied Respondent's request for sanctions as ill-supported but granted the parties additional time to submit their pretrial materials.

On February 10, 2014, Respondent moved to strike the People's hearing brief in whole or in part. Just before the disciplinary hearing, the PDJ **DENIED** Respondent's motion to strike. During the disciplinary hearing, the Hearing Board heard testimony from Respondent, Judge Alex Bencze, Justice Coyne, Shannon Wilson, and Barbara Dwyer and considered stipulated exhibits 1–32 and Respondent's exhibits A–I, N, and O.[1] After the close of the People's evidence, Respondent moved to dismiss the case and submitted written briefing in support of that request; the PDJ deferred ruling on the motion. Upon reviewing the evidence in the light most favorable to the People,[2] the PDJ **DENIES** Respondent's motion.

## III. FINDINGS OF FACT AND RULE VIOLATIONS

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on May 25, 1983, under attorney registration number 12722.[3] He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in these disciplinary proceedings.[4]

### Findings of Fact

On March 16, 2012, Rosa Julian–Quispe ("Quispe") was charged with one count of misdemeanor theft as an act of domestic violence in Arapahoe County Court case number 2012M1364.[5] The information alleged that on January 17, 2012, Quispe stole property valued between $500.00 and $1,000.00 from her former husband, Dameon Julian.[6] One of the items Quispe allegedly stole was a laptop.[7] Because the case was designated as one involving domestic violence, the Victims' Bill of Rights applied to the proceedings. Most saliently, this required that the alleged domestic violence victim, Julian, had the right to be notified of all critical stages of the proceeding. Quispe appeared before the county court on an arrest warrant on April 16, 2012,[8] and a personal recognizance bond was set at $5,000.00 with a return date of June 8, 2012.[9] As outlined in the pretrial release form, one of Quispe's bond conditions required her to report to court for all scheduled appearances; her failure to do so would result in issuance of a warrant for her arrest.[10]

Sometime before June 8, 2012, Quispe retained Respondent. Early in his career, Respondent had prosecuted criminal matters in the Aurora City Attorney's office for ten years. Thereafter, Respondent worked at several firms, where he focused on municipal law, before striking out on his own as a solo practitioner in 2006; since then, he has handled a variety of matters, mostly civil—including real estate, small business formation, probate, and trusts and estates—but with a limited amount of criminal defense work.

Quispe returned to court for a pretrial conference on June 8, 2012, with Respondent

1. Exhibit I was admitted for the limited purpose of showing Respondent's state of mind at the time of the events discussed herein.

2. *See Vikman v. Int'l Bhd. of Elec. Workers, Local Union No. 1269*, 889 P.2d 646, 654 (Colo.1995).

3. Respondent's registered business address is 3730 South Cathay Circle, Aurora, Colorado 80013–3622.

4. *See* C.R.C.P. 251.1(b).

5. Stip. Facts ¶ 2; Stip. Ex. 10.

6. Stip. Facts ¶ 1; Stip. Exs. 10–11.

7. Stip. Facts ¶ 7; Stip. Exs. 10–11.

8. Stip. Exs. 7, 11–12.

9. Stip. Facts ¶ 3; Stip. Exs. 7–8, 12 & 21.

10. Stip. Ex. 9. Respondent testified that not only had Quispe given him this paperwork, he was also generally aware of bond conditions for pretrial release.

by her side, which was the first time Respondent had ever appeared before County Court Judge Alex Bencze. During the conference, Judge Bencze granted the prosecution a mandatory protection order directing Quispe to stay away from and refrain from contacting Julian.[11] Judge Bencze also ordered Quispe to attend a second pretrial conference, a bond-returnable hearing, on July 24, 2012, at 1:30 p.m.[12] Respondent was also given the court's "Notice of Appearance," which advised Quispe that she was required to appear again on July 24, 2012.[13] Respondent acknowledged at the disciplinary hearing that he was familiar with standard-issue court documents concerning appearance and bond, including the footer appearing at the bottom of the "Notice of Appearance," which states that the court will grant continuances only on written motion.[14]

During June and July 2012, Respondent corresponded regularly with Justie Coyne, the deputy district attorney handling the matter, to advance two themes: first, that the criminal complaint was nothing more than a campaign by Julian to harass and exact revenge upon Quispe; and second, that the allegations were fabricated, as Julian had never owned a laptop. To that end, Respondent exchanged emails with Coyne, asking for proof of the laptop's serial number and a receipt documenting its purchase.[15] He also testified that during this period, he supplied Coyne with mitigation documents and other discovery that he and Quispe anticipated would lead to dismissal of the case. In particular, Respondent recalled giving Coyne statements drafted by Quispe's sons describing their father's history of resorting to violence and harassment. On July 19, Coyne emailed Respondent to inform him that she had reviewed the statements submitted by Quispe's sons, which she characterized as "disturbing."[16] She also mentioned the pretrial conference scheduled for July 24 and notified Respondent that "[I]f I change anything I will have to VBR [Victims' Bill of Rights] it with the alleged victim, and that could take some time."[17]

The day after this email correspondence, a gunman crept into a crowded movie theater in Aurora, Colorado, set off gas canisters, and then mowed the audience down in a mass shooting, killing many people and injuring countless others. Family friends of Respondent's were killed. The lone suspect, James Holmes, was arrested at the scene. In the aftermath of the tragedy, Respondent spent time reading about James Holmes. He also reviewed Quispe's divorce and medical records. Respondent testified that, like Holmes, there were "warning signs" relating to Julian; according to Respondent, Quispe's records suggested that Julian was a dangerous man who had seriously injured Quispe in the past and who continued to pose a substantial threat to her safety.[18]

At 11:46 a.m. on July 24—the day of the pretrial conference—Coyne emailed Respondent as a courtesy to notify him that Julian had ostensibly located a receipt and serial number for the laptop, which he intended to present at the pretrial conference that afternoon.[19] Because this new information would necessitate a follow-up investigation, Coyne stated, she anticipated again requesting that the pretrial conference be set over.[20] Respondent testified that he had not expected Julian to appear in court on that day. As such, two minutes later, at 11:48 a.m., Respondent replied, "I am wondering if we should be there if he intends to be there. This is intimidating for me [sic] client. Do you want to meet with Mr. Julian and then

11. Stip. Facts ¶ 5; Stip. Ex. 20.

12. Stip. Facts ¶ 6; Stip. Exs. 5–6.

13. Stip. Ex. 5.

14. Stip. Ex. 5.

15. *See, e.g.,* Stip. Ex. 32 at Beecher00246.

16. Stip. Facts ¶ 8; Stip. Ex. 32 at Beecher00239–41.

17. Stip. Facts ¶ 8; Stip. Ex. 32 at Beecher00239.

18. *See* Stip. Ex. 22 at Beecher00097. To illustrate his concerns regarding Julian, Respondent successfully introduced just one exhibit, a temporary civil protection order. *See* Ex. I.

19. Stip. Ex. 26 at Beecher00207.

20. Stip. Ex. 26 at Beecher00207.

we can set [a] new date?"[21] At 12:09 p.m., Coyne responded, "I suggest you be there on time. I don't want your client to get an FTA [failure to appear] for being late. I can arrange for [a] police escort to/from the courthouse and parking lot, too. I will do my best to keep it civil at all times."[22]

Although Respondent testified that the timeline of that afternoon is not now clear to him, he recalled attempting to contact Quispe after receiving Coyne's email, speaking with one or more of her sons before reaching Quispe, and ultimately discussing the situation with her. Importantly, it was during this conversation that Respondent assured Quispe he would obtain a continuance and advised her she need not appear. As Respondent explains in his hearing brief, he "believed he could obtain a continuance at the time he told [Quispe] he would do so" because Coyne "had just informed him by e-mail that she intended to set the matter over again for another pretrial [conference]."[23]

Out of the blue, at 12:37 p.m., Respondent sent Coyne a "bilious" email, as he termed it, accusing Coyne of unethically misleading him in order to set up a confrontation between Julian and Quispe.[24] He attached to the correspondence a copy of a motion to continue on a forthwith emergency basis.[25] At that juncture, Respondent was upset enough at Coyne to send this email by "cc" to an attorney for the People, as though to grieve her, although he retracted it the next day.

Shortly before 1:00 p.m., Coyne retorted that she was highly affronted by Respondent's remarks, that the Victims' Bill of Rights obligated her to inform Julian, the alleged victim, of all critical stages of the case, and that Quispe was under a court order to be present.[26] On that point, Coyne specifically stated:

I feel that your Motion to Continue on these grounds is inappropriate, as your client is under court order to be present today. However, in light of the fact that I will likely need to set the matter over anyway, I will not oppose the Motion to Continue or insist on the Defendant's appearance. Nevertheless, someone will need to be present on behalf of the Defendant to request the continuance. I will not request the continuance on the Defendant's behalf, as that is beyond the purview of my position and inappropriate.[27]

Right around that time, Shannon Wilson, a judicial assistant for Judge Bencze, was finishing her lunch break. Having taken lunch at her desk, she said she was "very irritated" that the phone kept ringing during that hour. She finally picked up the phone at 12:58 p.m., she recalled, only to be met with Respondent's hard, heavy breathing and a conversation that she did not understand fully. Once she realized the call was "going in a different direction" from any other exchange she had ever had with an attorney, she took notes, which formed the basis of a memorandum she wrote a few days later memorializing the conversation.[28]

Wilson testified that Respondent eventually identified himself as Quispe's counsel and complained to her that Coyne had set up a confrontation between Julian and Quispe, which amounted to "brutalization" by the district attorney's office. Further, she recounted that Respondent repeatedly referenced the Aurora theater shooting, likening the Aurora police department's efforts to address that tragedy to the department's handling of Quispe's situation. Wilson's notes also indicate that Respondent accused Judge Bencze of being "in on it" and likely responsible for arranging the Julian–Quispe encounter; notified her that he would not ap-

21. Stip. Facts ¶ 9; Stip. Ex. 26 at Beecher00206.

22. Stip. Facts ¶ 10; Stip. Ex. 26 at Beecher00205–06.

23. Respondent's Hr'g Br. at 3.

24. Stip. Ex. 26 at Beecher00205.

25. Stip. Ex. 26 at Beecher00205. Although referenced in Respondent's email, a copy of the attached motion was not included as part of stipulated exhibit 26, nor was it offered into evidence during the hearing.

26. Stip. Ex. 26 at Beecher00204; *see also* Stip. Facts ¶ 11.

27. Stip. Ex. 26 at Beecher00204.

28. *See* Stip. Ex. 24.

pear at the pretrial conference, having "spent all morning preparing" his motion to continue; informed her that he did not care whether he was reported to the disciplinary authorities; and warned her that he was going to call the press about the situation.[29]

Although Respondent concedes that Wilson grew quiet while he was "babbling" during the call, he testified that during the conversation he tried to convey that he faulted Coyne, not Wilson, for the predicament. He also explained that he referenced the Aurora theater shooting in order to illustrate that, as with the Aurora tragedy, "there were a lot of warning signs" that were being ignored in the case, since "Julian was someone who went around with red flags pasted all over him." But Respondent disputes a substantial portion of Wilson's version of the conversation, accusing her of being "adverse" to his interests because she was annoyed at being bothered over her lunch hour. We credit Wilson's account, however: we find her a far more reliable witness whose story, unlike Respondent's, is corroborated by Judge Bencze's recollection, as well as by Respondent's own emails to Coyne, which repeated many of the same themes.

Both Respondent and Wilson agree, however, that Respondent inquired whether he could move for a continuance without a written motion and, finding that he could not, asked whether the court would accept a faxed or emailed motion. When Wilson told him that court policy disallowed such motions, Respondent said he "floated some other ideas," including appearing by telephone or employing a courier to file a written motion. Ultimately, Wilson advised Respondent that he would be required to appear in court to hand deliver the motion or to orally move for a continuance. Respondent gave Wilson his number and asked her to seek an exception on his behalf.

After the call, Wilson approached Judge Bencze, who testified that Wilson seemed "frightened, confused, and nervous." Wilson relayed to Judge Bencze that Respondent wished to continue the pretrial conference without appearing or submitting a written motion. At the disciplinary hearing, Judge Bencze testified that he never excuses defendants on bond in domestic violence cases from appearing for mandatory bond-returnable court dates. Further, Judge Bencze explained, he was not prepared to simply grant an exception to that policy on the basis of Respondent's "bizarre" verbal exchange with Wilson.

Following his discussion with Wilson, Respondent penned a reply to Coyne's previous email. He stated in part:

> If you are affronted, my response was pretty much dictated by your insouciant and cynical initial response to my concerns. How did you put it? 'I would suggest you be there on time.' That made it quite clear to me that you were simply dismissing my/my client's concerns. That, together with your comment about the court order (read: 'she has to be there no matter what the prosecution my [sic] spring on her') sounds to me a lot like, hurry up and get to the Aurora theatre on time. That same level of sensitivity. It says clearly that you are completely unconcerned with whatever might happen. But this is my client, and I think it appropriate to be more not less security conscious just now. Besides, the only result likely to come about OTHER than violence is the severe intimidation of my client, and it is my job to protect her from that sort of thing.[30]

Without waiting for a response, Respondent then composed another email to Coyne, which he sent just seven minutes later at 1:23 p.m. In that email, Respondent thanked Coyne for not opposing the continuance, informed her that he would not be at the pretrial conference because he had "spent the travel time preparing our motion," and invited her to "tell the judge to hit me as hard as he can" and "to have him make me an example," explaining that he would "feel it almost an honor to go to jail in the name of security and protecting victims of violence...."[31]

**29.** Stip. Ex. 24.

**30.** Stip. Facts ¶ 12; Stip. Ex. 27.

**31.** Stip. Ex. 26 at Beecher00203.

Neither Respondent nor Quispe appeared for the pretrial conference at 1:30 p.m.[32] A warrant was issued for her arrest due to her failure to appear; her personal recognizance bond was deemed forfeited and replaced with a bond of $10,000.00 cash, property, or surety.[33]

At 3:30 p.m., Respondent again telephoned Wilson, who was processing court documents from the 1:30 p.m. docket. Respondent asked whether the judge had issued a warrant for Quispe's arrest.[34] Wilson told him that because neither he nor Quispe had appeared, Judge Bencze had indeed issued a warrant. Respondent answered, "You and the judge are pathetic." [35] Respondent then asked to speak with Judge Bencze. When Wilson said the judge was unavailable, Respondent ended the call. Wilson's notes reflect that she fielded two other calls from Respondent that afternoon. On one occasion, he hung up on her after she refused to allow him to speak with Judge Bencze. On the second occasion, he asked Wilson how the judge would rule on his motion; when Wilson reminded him that Judge Bencze had not yet received any motion on which to rule, Respondent "started to talk about James Holmes." [36]

Throughout that afternoon, Respondent also traded at least eight emails with Coyne. He inquired whether Judge Bencze was aware of his motion to continue, suggested they "simply do the continuance we had already agreed upon," or "continue the case retroactive" to the pretrial conference, and implored her to exercise prosecutorial discretion to address the situation.[37] Coyne twice told Respondent that she would respond to his motion when he filed it and asked him to refrain from contacting her in the meantime.

At the disciplinary hearing, Respondent offered imprecise—and unconvincing—testimony that sometime during the afternoon of July 24, one of Judge Bencze's assistants instructed him that he would not at any time be permitted to "walk in" to the courtroom to seek to quash Quispe's arrest warrant. But neither of Judge Bencze's assistants corroborated Respondent's memory on this point. Judge Bencze stated that he has never instructed his staff to turn away parties who appear late for a court date, and he testified that he would have made himself available at any time to address an outstanding bench warrant. Further, Respondent's own correspondence contradicts his statement: in a May 2013 letter to the People, Respondent wrote, "When I called both Ms. Wilson and the other clerks, and they would not accept a faxed motion (and I realized I could not e-file), I became increasingly concerned. I asked if I could show up around closing time, at 5 p.m., or just *late*, and was told that I should come in with my client one of the next two mornings at 8 a.m." [38]

Respondent also claims to have visited the Arapahoe County courthouse late in the afternoon of July 24, right as the clerk's office was closing. He testified that Judge Bencze's division was closed, so he presented his motion to a woman wearing a long brown dress who was helping at the clerk's window. Although she stamped his motion, he testified, he did not retain a date-stamped copy, and the filed motion never appeared on a registry of actions or was given to Judge Bencze. The Hearing Board does not find this account credible. That the motion "disappeared" in the clerk's office, never to resurface before Judge Bencze or on the registry of actions, strikes us as improbable. As described above, Respondent was engaged during much of the afternoon in an email exchange with Coyne, also making it unlikely that he would travel to the courthouse during that time. Finally, Respondent's decision to file his motion to continue the next day (as discussed below) bolsters our conclusion that he did not visit the courthouse on July 24; had he filed the motion then, he would have

---

32. Stip. Facts ¶ 13.

33. Stip. Facts ¶ 13.

34. Stip. Facts ¶ 14.

35. Stip. Ex. 24.

36. Stip. Ex. 24.

37. Stip. Ex. 26 at Beecher00199–203.

38. Stip. Ex. 22 at Beecher00098.

had no reason to submit a substantially similar pleading the next afternoon.

The next day, July 25, at 2:53 p.m., Respondent filed an "Emergency Forthwith Motion to Continue" in which he admitted that Quispe failed to appear upon his advice.[39] He did not provide a courtesy copy to Judge Bencze. Coyne testified that this motion was only "slightly different" from the motion he had emailed her about twenty-six hours before, as the earlier emailed motion did not contain the first bolded paragraph that appears in the filed motion.[40] Because motions often do not reach divisions for twenty-four to forty-eight hours after they are filed with the clerk's office, Judge Bencze did not receive Respondent's forthwith motion until Friday, July 27. He reviewed the motion and instructed Barbara Dwyer, another of his judicial assistants, to promptly set a motions hearing promptly. Dwyer emailed Coyne and left a voicemail for Respondent in the hopes of setting the hearing early Monday morning, July 30. But Respondent was out of the office for a long weekend, so he did not receive Dwyer's voicemail until the morning of July 30. One of Respondent's assistants then contacted Dwyer, who set the motions hearing for the next day.

On July 31, Respondent appeared before the court on his motion without Quispe, who, according to Respondent, had to work.[41] Respondent recalled that he arrived to a "packed courtroom," which fell silent when Judge Bencze began to speak to him. "There was no question [the judge] was angry," Respondent testified, noting that he was caught off-guard by the judge's emotion, which he perceived as stemming from concern about Wilson's treatment. That Judge Bencze was focused on the treatment of his clerks, not on Quispe's outstanding warrant, contended Respondent, suggests that Respondent's communications were actually at the heart of the disciplinary complaint in this case.

At the disciplinary hearing, Judge Bencze denied that he was angry with Respondent, although he acknowledged that he had a "stern aspect" to his voice, which he may have raised when he inquired about Respondent's conversations with Wilson. Nevertheless, Judge Bencze testified, his main objective was to determine why neither Respondent nor Quispe had appeared on July 24 and to emphasize the importance of Quispe's attendance at mandatory bond-returnable court dates. Because Quispe was not present, Judge Bencze refused to quash her warrant. Soon thereafter, he filed a grievance against Respondent, based on his grave concerns about Respondent's conduct, and then recused himself from Quispe's case.[42]

Chief Judge Sylvester reassigned the matter to Judge Cheryl Rowles–Stokes. Respondent and Quispe appeared before Judge Rowles–Stokes on August 2, having arranged for a private security guard to meet Quispe off-site and accompany her to the courthouse. Before Judge Rowles–Stokes, Respondent argued that Quispe's warrant should be quashed and the bond reduced, explaining that Quispe "did not appear because of me, due to mistakes I made, and assumptions I have made that turned out not to be correct."[43] Judge Rowles–Stokes quashed the bench warrant, which by that point had been outstanding for nine days. A few months later, Coyne dismissed the charges against Quispe.

### Failure to Provide Competent Representation (Colo. RPC 1.1)

The People contend in Claim I that Respondent violated Colo. RPC 1.1, which mandates professional competence, by advising Quispe not to appear for the bond-returnable hearing set for July 24, even though he was aware her appearance was a mandatory condition of her pretrial supervision. Respondent defends his behavior in this matter as protective of Quispe, and he prides himself

39. Stip. Facts ¶ 16; Stip. Ex. 4.

40. *See* Stip. Ex. 4.

41. Stip. Facts ¶ 17; Stip. Ex. 28 at 2:21–3:2.

42. Stip. Ex. 2.

43. Stip. Ex. 29 at 2:21–23.

on having "achieved the *ideal* resolution for [Quispe], the unfettered, unqualified, flat dismissal of the case against her." [44] He also explained that his actions were designed to "solidify the continuance" that he thought he had arranged with Coyne, expecting, based on his experience, that a stipulated continuance would be easily granted.

Colo. RPC 1.1 states, "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Comment 5 to that rule explains that competent handling of a particular matter includes the use of methods and procedures meeting the standards of competent practitioners. Similarly, the American Bar Association's *Annotated Model Rules of Professional Conduct* explains that competence encompasses both knowledge of procedure and knowledge of applicable court rules. [45]

The Hearing Board concludes that Respondent's advice to Quispe fell below the standards of a competent practitioner in navigating court procedures and rules. Even though Quispe's bond had been continued to July 24 and the court had directed her to appear on that date, Respondent advised her that she need not attend the pretrial conference. Respondent acknowledged not only that he was generally aware that pretrial release conditions on bail bond require appearances for mandatory court dates, but also that Quispe had provided him all of her records regarding her bond. He also testified that he had reviewed the court's April 8 "Notice of Appearance," which ordered Quispe to attend court at 1:30 p.m. on July 24 and which stated that motions to continue must be made in writing.

Respondent protests that he advised Quispe not to appear because he assumed Judge Bencze would readily grant a continuance to which the parties stipulated. But Respondent had never appeared before Judge Bencze prior to representing Quispe, so his assumption that Judge Bencze's policies would exactly mirror those of other judges was risky and unwise. Relying on his outdated experience obtaining continuances when he prosecuted municipal misdemeanors was also irresponsible, as municipal court procedures are not controlling and were at odds with the court's clear and unambiguous orders.

More critically, Respondent failed to appreciate the distinction between stipulating to a continuance of the pretrial conference and waiving the appearance of a defendant on bond. Judge Bencze explained that even if the parties had agreed to a continuance, he would have required Quispe to appear so that he could order her to attend the next bond-returnable court date. And, as Coyne testified, even though she promised not to oppose a continuance, she did not have the authority to grant the continuance or excuse Quispe's appearance, which only the court could do. In fact, Coyne discussed this with Respondent in one of their email exchanges prior to the 1:30 p.m. docket—written *before* Quispe failed to appear—when Coyne made clear that although she would not oppose the motion to continue, Quispe still remained under court order to be present. [46] To advise Quispe not to appear, and then to refuse to reevaluate this advice in the face of Coyne's warning, was to provide Quispe deficient counsel concerning court procedures and rules.

We cannot endorse Respondent's contention that his behavior was justified in order to keep Julian away from Quispe and thus to avoid violence. As the People observe, even a "noble motive does not warrant departure from the Rules of Professional Conduct." [47] But as a practical matter, Respondent need not have resorted to his chosen course of action: a panoply of options existed to ensure Quispe's safety during the pretrial conference, yet Respondent neglected to pursue any of them. He neither accepted Coyne's offer of courthouse security, nor specifically inquired of Wilson whether Judge Bencze could provide assistance, nor arranged for a private security detail, as he later did on August 2. Any of these remedies would have

---

44. Respondent's Mot. to Dismiss ¶ 7.

45. American Bar Association, *Annotated Model Rules of Professional Conduct* 22 (6th ed.2007).

46. Stip. Ex. 26 at Beecher00204.

47. *In re Pautler,* 47 P.3d 1175, 1180 (Colo.2002).

been very easy to execute, and the consequence for not doing so was extremely predictable. Although Respondent may have feared for Quispe's safety, he appears to have been blinded by that concern, which interfered with his capacity to problem-solve and exercise good judgment.

We also reject Respondent's argument that his representation was per se competent because Quispe's case was ultimately dismissed. Respondent's advice to Quispe on July 24 did not contribute to the case's dismissal. Far from it, in fact: the advice in question represented a detour that took Quispe further away from that goal. Further, as the commentary to the *Annotated Model Rules of Professional Conduct* suggests, competence is not measured only by results, but also by the procedures employed to achieve those results.[48] This is because cases do not rise and fall solely on the basis of a lawyer's performance; the merits of the case frequently dictate its ultimate disposition, often utterly divorced from legal strategy or tactics.[49] Just as one cannot per se ascribe incompetence to all attorneys representing clients who do not prevail, nor can one *ipso facto* consider competent all attorneys who are retained to advance what prove to be meritorious claims or defenses. Here, it is enough to find that regardless of the ultimate outcome, Respondent's initial advice to Quispe was incompetent, as was his failure to heed Coyne's good counsel and reconsider that advice. The Hearing Board therefore concludes that Respondent violated Colo. RPC 1.1.[50]

### Advising Criminal Conduct (Colo. RPC 1.2(d))

■ In Claim II, the People allege Respondent violated Colo. RPC 1.2(d), which forbids a lawyer from counseling clients to engage, or assisting clients, in conduct that the lawyer knows is criminal or fraudulent. Claim II is premised upon Respondent's advice to Quispe that she need not attend the pretrial conference on July 24—advice, they argue, that violated the court's order and Quispe's bond conditions. As a result, the People aver, a bench warrant was issued for Quispe's arrest, and she potentially faced imposition of additional criminal charges for violating her bond. Respondent objects on the grounds that he advised Quispe not to appear because he thought he would obtain a continuance. As such, Respondent contends that he believed what he was advising Quispe to do was completely legal, not criminal or fraudulent.

The Hearing Board concludes that the People have failed to prove each element of Claim II. Although the People claim that Quispe knowingly violated conditions of her bond by failing to appear on July 24, they did not present any evidence showing that such a violation constitutes criminal conduct. When the Hearing Board directed the People to C.R.S. section 18–8–212(2) during their closing, they then argued that Quispe had violated this statute, which provides that a person commits a class-three misdemeanor if she knowingly fails to appear for proceedings in which bail bond is filed or knowingly violates conditions of bail bond.

However, Colo. RPC 1.2(d), read in conjunction with this statute, demands clear and convincing proof of a dual mental state: first, under Colo. RPC 1.2(d), that the lawyer *knew* he was counseling the client to engage in criminal behavior, and second, under

---

**48.** American Bar Association, *Annotated Model Rules of Professional Conduct* 22.

**49.** *See generally* Morris B. Hoffman, *10 Trial Mistakes*, 8 W. Va. Law. 11–12 (Nov. 1994) ("The side with the best case almost always wins, and the performance of the lawyers almost never matters. Some of the best lawyering I've ever seen has resulted in spectacular losses. And some of the most bumbling lawyers have had the fortune of attaching themselves to strong, and therefore winning, cases.").

**50.** *See Attorney Grievance Comm'n of Md. v. Snyder*, 368 Md. 242, 793 A.2d 515, 531 (2002) (finding that attorney's failure to research whether his client, a criminal defendant, needed to be present at her initial appearance, as well as his failure to have her arrest warrant recalled once he learned of its issuance, provided sufficient evidence that he had violated MRPC 1.1); *Attorney Grievance Comm'n of Md. v. Mooney*, 359 Md. 56, 753 A.2d 17, 26–27 (2000) (holding that an attorney whose office staff incorrectly instructed a client that he need not appear in court for trial provided incompetent representation).

C.R.S. section 18–8–212(2), that the criminal defendant *knowingly* failed to appear or *knowingly* violated bail bond conditions. The People did not prove that Respondent knew he was advising Quispe to engage in criminal behavior. We conclude that at the time he spoke with Quispe he believed that he could obtain a continuance, so when he advised her to appear he had no knowledge that he was counseling her to commit a criminal act.

Likewise, the People did not prove that Quispe knowingly violated conditions of her bail bond. The Hearing Board heard evidence that Quispe had received a notice of appearance and had been advised that she must appear as a condition of her pretrial release. The Hearing Board also heard evidence that Quispe failed to appear based on Respondent's mistaken advice and incorrect assumptions. Because this evidence is balanced in relative equipoise, and because neither party called Quispe as a witness, the Hearing Board is left to speculate as to her mental state. We therefore cannot determine that Quispe knowingly violated conditions of her bail bond. Accordingly, the People failed to meet their burden of demonstrating by clear and convincing evidence that Respondent violated Colo. RPC 1.2(d).

### Conduct Prejudicial to the Administration of Justice (Colo. RPC 8.4(d))

■ The People's third claim is based on Colo. RPC 8.4(d), which proscribes conduct prejudicial to the administration of justice. The People catalog several ways in which they believe Respondent violated this rule: by failing to appear in court on July 24; by failing to provide Quispe competent legal advice; by knowingly advising Quispe to disregard the court's order; by failing to expeditiously file the appropriate motion to continue the matter; and by appearing before the court without Quispe on July 31. Respondent depicts this claim as a shotgun, catchall approach and asserts that his conduct did not adversely affect the administration of justice.

The Hearing Board concludes Respondent contravened Colo. RPC 8.4(d) by refusing to attend the pretrial conference as he and his client were ordered to do in the "Notice to Appear" issued by the court on June 8. This misconduct was magnified by his delay in addressing the bench warrant issued for Quispe's arrest. We also find that he violated Colo. RPC 8.4(d) by failing to ensure Quispe's appearance on July 31. While we accept that Respondent felt protective of Quispe, we cannot fathom why those feelings would have precluded *him* from appearing in court to attempt to protect her legal interests. Similarly, given his desire to shield Quispe from harm, we do not understand why Respondent delayed for more than twenty-five hours in filing any motion to quash the warrant for Quispe's arrest, or why he did not secure her appearance in court on July 31.

Respondent's contention that he was unable to attend the pretrial conference is not credible. Respondent was alerted to Julian's possible presence at the pretrial conference only at 11:46 a.m. that day—belying his assertion that he had labored on the motion for the entire morning. Moreover, even if he had spent the morning drafting the motion, he would not as a result be excused from attending the conference. Further, Respondent testified that his office was located approximately half an hour from the courthouse, and by 12:37 p.m. he had emailed Coyne a serviceable draft of a motion—disproving his contention that he had "spent the travel time" preparing the pleading. Why Respondent would therefore be unable to appear in court at 1:30 p.m. with his motion is, as Judge Bencze put it, "befuddling." Equally perplexing is why Respondent would spend time exploring whether he could fax, email, e-file, or courier his motion, rather than simply traveling to the courthouse to deliver it himself. For answers, we can only take Respondent at his word and assume that he felt it would be an honor to take a stand "in the name of security and protecting victims of violence...."[51]

We therefore find that Respondent was not justified in ignoring the warnings of Wil-

---

51. Stip. Ex. 26 at Beecher00203.

son and Coyne—who both instructed him that he would be required to appear in person—and refusing to attend the pretrial conference on July 24, disobeying the court's "Notice to Appear." He compounded this misconduct by inexcusably delaying in attempting to remedy his and Quispe's failure to appear. As discussed above, we find that Respondent did not visit the courthouse or file his prepared motion to continue on July 24. He did not appear with Quispe in Judge Bencze's courtroom on the morning of July 25 or 26, as he was purportedly instructed to do by a staff member.[52] He waited until the afternoon of July 25 to file his emergency forthwith motion to continue and never provided Judge Bencze with a courtesy copy of the motion in order to expedite its review. And he appeared in court on July 31 without securing Quispe's attendance. Not only was Quispe's liberty jeopardized as a result, but Judge Bencze's staff expended time and effort to revoke Quispe's bond and to issue a bench warrant for her arrest. In addition, Judge Rowles–Stokes was required to hold a pretrial conference after Quispe failed to appear on July 31. Through this misconduct, Respondent prejudiced the administration of justice in contravention of Colo. RPC 8.4(d).[53]

## IV. SANCTIONS

■ The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[54] In imposing a sanction after a finding of lawyer misconduct, the Hearing Board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction

that may be adjusted in consideration of aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* As a criminal defendant, Quispe relied on Respondent to ably guide her through the criminal process, but Respondent violated his duty to competently represent his client by giving her incorrect advice concerning court procedures and rules. This advice, coupled with Respondent's own failure to appear, also violated his duty to the legal system because it prejudiced the administration of justice.

*Mental State:* Respondent negligently failed to appreciate relevant court procedures and rules when he advised Quispe not to appear and disregarded information he subsequently received from Coyne that contradicted his ill-informed assumptions. In contrast, Respondent's own failure to appear, and his delay in addressing the fallout from his incompetent advice, can best be characterized as knowing. Respondent was fully aware that he failed to appear and that he delayed in attempting to rectify that failure, but we do not find that he acted with any conscious objective to waste court resources or otherwise prejudice the administration of justice.

*Injury:* Respondent's incompetent advice caused potential injury to Quispe, who relied to her detriment on his assurances that she need not appear for the pretrial conference. As a result, her personal recognizance bond was deemed forfeited and replaced with a bond of $10,000.00 cash, property, or surety. Moreover, Respondent's incompetent advice led to the issuance of a bench warrant for her arrest, which remained outstanding for

---

**52.** *See* Stip. Ex. 22 at Beecher00098.

**53.** *See Snyder*, 793 A.2d at 532 (affirming a determination that a lawyer's failure to appear at his client's initial appearance constituted conduct prejudicial to the administration of justice); *Mooney*, 753 A.2d at 31 (observing that an attorney's failure to appear in court interferes with the administration of justice because the attorney's absence is immediately cognizable by the judge and intrudes upon the operation and dignity of the court); *see also In re Moore*, 692 N.W.2d 446, 448–49 (Minn.2005) (describing a referee's

findings that an attorney violated Minn. R. Prof. Conduct 8.4(d)—though not 1.1—by failing to attend a hearing she scheduled for a client, failing to inform the court she would not attend, failing to attempt to obtain a continuance, advising her client that he need not appear, and failing to apprise her client of the potential consequences of not attending).

**54.** *See In re Roose*, 69 P.3d 43, 46–47 (Colo. 2003).

nine days; had she been stopped by the police during that period, she might have been jailed until her next court appearance. By following Respondent's advice and failing to appear, Quispe also could have been found in contempt of court, and the district attorney could have filed criminal charges against her for violating a bond condition, a class-three misdemeanor. Conviction on this charge would have mandated Quispe's imprisonment of not less than six months in county jail without the possibility of a suspended sentence or probation.

Further, Respondent's own failure to appear guaranteed that a bench warrant would immediately issue for Quispe's arrest: Judge Bencze and Coyne both testified that had Respondent appeared without Quispe, execution of the warrant very likely would have been stayed pending Respondent's efforts to secure Quispe's attendance.

Respondent's advice to Quispe, his own failure to appear at the pretrial conference, and his delay in rectifying the consequences of his bad decisions caused actual injury to the legal system. Judge Bencze's staff was required to spend time revoking Quispe's bond and issuing a warrant for her arrest, answer Respondent's several inappropriate telephone calls, communicate about and schedule additional hearings to address the matter, and reset the pretrial conference twice. Judge Bencze and Judge Rowles–Stokes then presided over the additional hearings to address the two instances in which Quispe failed to appear.

### ABA *Standards* 4.0–7.0—Presumptive Sanction

Public censure is the presumptive sanction under ABA *Standard* 4.53 when a lawyer demonstrates a failure to understand relevant legal doctrine or procedures and causes potential injury to a client. Suspension is the presumptive sanction under ABA *Standard* 6.22 when a lawyer knowingly violates a court order or rule, leading to interference or potential interference with a legal proceeding. In cases involving multiple types of attorney misconduct, the ABA *Standards*

recommend that the ultimate sanction should at least be consistent with the sanction for the most serious disciplinary violation and generally should be greater than the sanction for the most serious misconduct.[55] Based on these standards, the presumptive sanction in this case is suspension.

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

Aggravating circumstances include any considerations or factors that may justify an increase in the degree of the presumptive sanction to be imposed, while mitigating circumstances may warrant a reduction in the severity of the sanction.[56] The Hearing Board considers evidence of the following aggravating and mitigating circumstances in deciding the appropriate sanction.

*Prior Disciplinary Offenses—9.22(a):* In 2009, Respondent was suspended for one year and one day, all but ninety days stayed upon the successful completion of a two-year period of probation, which terminated on March 21, 2012—just four months prior to the misconduct at issue here.

In that case, Respondent was found to have carried on an intimate, albeit non-sexual, relationship with his client, which created a conflict in representing her interests in a divorce where the legal issues involved division of property and maintenance, but not marital fault. During that representation, Respondent's client advocated for a strategy of deposing her husband and her adult son about her husband's alleged sexual misconduct during the course of their twenty-four-year marriage, including allegedly sexual misconduct involving her minor daughter. By adopting his client's improper plan to ask deposition questions that served no substantial legal purpose and that created unnecessary animus among the family members, Respondent failed to exercise professional and independent judgment on behalf of his client. Notably, the hearing board in that case concluded that Respondent implemented his client's strategy "without proper reflection and independent judgment," observing that

---

**55.** ABA *Standards* § II at 7.

**56.** *See* ABA *Standards* 9.21 & 9.31.

Respondent saw himself as his client's "personal protector, as opposed to her counsel," thereby losing "all objectivity and the independent judgment he needed to help [his client] navigate through an emotionally trying divorce." [57]

This prior misconduct significantly influences our sanctions analysis.[58] Indeed, we include an extended discussion of Respondent's prior disciplinary history here to place in context our concern that, in an effort to play the role of protector, Respondent has twice transformed routine, run-of-the-mill legal disputes into senseless confrontations by groundlessly accusing others of wronging his clients.

*Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g):* Although Respondent declared that he was remorseful for what had happened and that he would not make the same mistakes again, we find that he has refused to recognize the wrongful nature of his misconduct. During the disciplinary hearing, he maintained that his conduct was entirely justified and appeared to blame Judge Bencze, Coyne, and Wilson, whom he characterized as a "buzz saw of a clerk." He also argues in briefing that if he avoided violence in keeping Quispe away from Julian, "he should have been commended, moreover, and Judge Bencze's unwillingness to flex under the circumstances should not be considered the ideal response to the situation that was placed before him." [59]

*Substantial Experience in the Practice of Law—9.22(i):* Respondent was admitted to the bar in 1983 and practiced in the Aurora City Attorney's office for ten years at the start of his career. The misconduct at issue here does not reflect well on such a longstanding practitioner. .

*Absence of Dishonest or Selfish Motive— 9.32(b):* The Hearing Board is convinced that Respondent did not act with a dishonest or selfish motive during the course of his misconduct. He believed Quispe was at risk and was in part motivated by this concern.

*Personal or Emotional Problems—9.32(c):* Respondent briefly suggested that the stress surrounding his loss of family friends in the Aurora theater shooting just days before the misconduct in question mitigates his misconduct. In our view, this evidence is simply not enough to support application of this factor, and thus we give it no weight.

### Analysis Under ABA *Standards* and Colorado Case Law

The Colorado Supreme Court has directed us to exercise our discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[60] mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases." [61] Although prior cases are helpful by way of analogy, a hearing board should determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis.

The Colorado Supreme Court has both publicly censured and suspended attorneys who failed to competently represent clients or to follow court rules or orders. In *People v. Moskowitz*, an attorney neglected to adequately prepare and investigate a bankruptcy case, which prevented him from realizing that an involuntary bankruptcy petition was ill-advised and without factual or legal basis.[62] Because the attorney was found to have acted negligently, rather than knowingly, and because he had not been disciplined before, the Colorado Supreme Court approved a public censure as appropriate.[63]

---

57. Op. and Order Imposing Sanctions Pursuant to C.R.C.P. 251.19(b) at 16, 11 (Case number 07PDJ081, Feb. 3, 2009, *aff'd* Nov. 2, 2009).

58. *See* C.R.C.P. 251.19(a) (directing the Hearing Board to take into consideration Respondent's prior disciplinary record).

59. Respondent's Hr'g Br. at 7.

60. *See In re Attorney F.*, 285 P.3d 322, 327 (Colo. 2012); *In re Fischer*, 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overem-

phasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

61. *In re Attorney F.*, 285 P.3d at 327; *In re Rosen*, 198 P.3d 116, 121 (Colo.2008).

62. 944 P.2d 76, 77 (Colo.1997).

63. *Id.* at 78.

Likewise, in *People v. Silvola,* public censure was imposed where an attorney inadequately and incompetently prepared for trial.[64] He also filed a civil action on his client's behalf, which he offered to dismiss if the criminal charges were dropped, thereby prejudicing the administration of justice.[65] Although this misconduct was aggravated by a prior admonition, it was mitigated by absence of a dishonest motive and cooperation in the disciplinary investigation.[66] The Colorado Supreme Court therefore accepted a stipulation of public censure, but some members of the court would have rejected the sanction as too lenient.[67] Public censure was also ordered in *People v. Fieman.*[68] There, the respondent attorney was directed by a court to file a status report within fifteen days but failed to do so for more than a year and a half.[69] Taking into account the attorney's medical problems, his two prior letters of admonition, and his substantial experience as a lawyer, public censure was ordered.[70]

Suspensions have been imposed for incompetence when it was coupled with conduct that prejudiced the administration of justice. Most comparably, in *People v. Aron,* the attorney provided incompetent legal advice to a client who wished to obtain full custody of her sons and who contemplated keeping them in Arizona past her allotted parenting time.[71] The attorney researched whether Arizona courts might take jurisdiction of the custody matter and recommended that the client seek Arizona counsel, but he neglected to tell her that keeping her sons in Arizona in violation of a Colorado custody order could constitute a felony under Colorado law.[72] He also failed to discover that Arizona would not

assume jurisdiction if his client violated the Colorado custody order.[73] Ultimately, his incompetent advice led to his client's criminal conviction.[74] The hearing board concluded that the attorney was either unaware of or mistaken about the criminal consequences of violating a child custody order, and it found that he contravened Colo. RPC 1.1 and 8.4(d).[75] Considering the magnitude of the harm, the attorney's substantial legal experience, and his failure to participate meaningfully in the proceedings, counterbalanced by the absence of a prior disciplinary history and his lack of a dishonest and selfish motive, the Colorado Supreme Court approved a thirty-day suspension.[76]

In a similar vein, suspension was imposed in *People v. Davies,* where an attorney knowingly prepared and filed child support worksheets that failed to properly reflect a new stipulation concerning division of custody, leading to errors in the child support calculations in violation of Colo. RPC 1.1 and 8.4(d).[77] Considering the absence of mitigators and the three aggravating factors—the attorney's failure to cooperate in the disciplinary proceedings, his two previous disciplinary offenses, including a ninety-day suspension, and his refusal to acknowledge the wrongful nature of his conduct—the hearing board suspended the attorney for one year and one day.[78] The hearing board also required him to petition for reinstatement, demonstrating that he had made appropriate restitution and he was emotionally and psychologically fit to practice law.[79] The Colorado Supreme Court affirmed.[80]

---

64. 888 P.2d 244, 244 (Colo.1995).

65. *Id.* at 245.

66. *Id.*

67. *Id.*

68. 788 P.2d 830, 832 (Colo.1990).

69. *Id.* at 831.

70. *Id.* at 832.

71. 962 P.2d 261, 262 (Colo.1998).

72. *Id.*

73. *Id.*

74. *Id.* at 263.

75. *Id.*

76. *Id.*

77. 926 P.2d 572, 573 (Colo.1996).

78. *Id.* at 573–74.

79. *Id.*

80. *Id.* at 572, 574.

Suspensions of varying lengths have also been imposed when lawyers have adversely affected the administration of justice by failing to comply with court rules or orders. The Colorado Supreme Court imposed a thirty-day suspension with the requirement of reinstatement in *In re Bauder*, where the attorney failed to pay the costs of a prior disciplinary proceeding in violation of Colo. RPC 3.4(c) and 8.4(d).[81] No mitigating factors and four aggravating factors were present, including prior disciplinary history, refusal to acknowledge the wrongfulness of his conduct, and substantial experience in the practice of law.[82] In *People v. Huntzinger*, an attorney, the defendant in a legal malpractice suit, refused to pay court-ordered attorney's fees for submitting a frivolous summary judgment motion and then failed to attend his own deposition in the case, contravening Colo. RPC 3.4(c) and 8.4(d).[83] With three aggravating factors and no mitigators, a three-month suspension was ordered, and payment of the attorney's fees was made a condition of the attorney's reinstatement.[84] A suspension of one year and one day was imposed in *In re Roose*, where the lawyer violated Colo. RPC 1.1, 3.4(c), and 8.4(d) by leaving a courtroom in violation of the court's explicit order not to do so and knowingly making false statements in an appellate brief.[85]

In this case, Respondent's misconduct stemmed from his concern for Quispe's safety, was of relatively short duration, caused Quispe no actual harm, and was remedied without difficulty when Respondent and Quispe finally appeared in court. But unlike the negligent conduct in *Moskowitz*, Respondent *knowingly* refused to appear at the pretrial conference, even though he easily could have done so. Further, like the lawyer in *Davies*, Respondent refused to acknowledge his misconduct and has a prior disciplinary history that includes a ninety-day suspension. As in *Bauder*, *Huntzinger*, and *Roose*, Respondent prejudiced the administration of justice by refusing to comply with

explicit court orders—conduct that was compounded by the presence of several aggravating factors. Respondent's behavior might be most akin to the misconduct described in *Aron*, where the lawyer failed to notify his client of the potential repercussions of his advice but acted without a dishonest or selfish motive. In contrast with that case, the harm here is minimal but, unlike that lawyer, Respondent knowingly prejudiced the administration of justice and has a serious prior disciplinary history.

Taking into consideration the nature of Respondent's conduct, the one mitigating and three aggravating factors, and the relevant case law, we conclude Respondent should be suspended for six months, with the requirement that he petition for reinstatement. In so doing, we recognize that the lawyering tasks involved in Quispe's case were neither complex nor unusual and that the rule violations at issue are relatively minor when measured by the injury they caused. Nevertheless, we impose this sanction to reflect Respondent's ineptitude in Quispe's misdemeanor matter, which he mishandled so as not only to expose Quispe to possible arrest, but also to offend Judge Bencze, his staff, and Coyne—all to no purpose.

In imposing this sanction, we are most swayed by Respondent's prior disciplinary case, which, while it does not concern parallel rule violations to those at issue here, reflects a similar and troubling quixotry. In both this case and his earlier disciplinary matter, Respondent jettisoned his good judgment, fueled by what seem to be protective impulses toward his female clients. Rather than relying on his legal training to help resolve his clients' issues, in both cases he abandoned his role as an officer of the court and legal counselor and instead reacted as a combatant, without due regard for the consequences. Further, although we do not rely on them to find rule violations, Respondent's rash, emotional outbursts while communicating with Coyne and Wilson, as described in

**81.** 980 P.2d 507, 508 (Colo.1999).

**82.** *Id.*

**83.** 967 P.2d 160, 161–62 (Colo.1998).

**84.** *Id.*

**85.** 69 P.3d at 44–46.

this opinion, illustrate our concern with what seems to be an emerging pattern: during the course of representing clients, Respondent has twice been blinded by his emotions in the heat of the moment. In this matter, Respondent's hair-trigger reaction escalated what should have been a simple matter, culminating in a series of bizarre verbal exchanges with Wilson that left her visibly frightened. He also reflexively reported Coyne to the disciplinary authorities based on his self-described incorrect assumptions.

Such impetuous, irrational behavior, coupled with similar conduct in Respondent's first disciplinary case, leads us to conclude that he should serve a meaningful suspension, followed by a process of petitioning for reinstatement. To impose a suspension shorter than his prior sanction—a served suspension of ninety days—would trivialize his misconduct and send the wrong message that similar future offenses, even those amplified by other significant aggravators, might not be met with mounting discipline. Requiring Respondent to petition for reinstatement recognizes the worrisome nature of his developing pattern and encourages him to explore, prior to resuming his law practice, how best to control his passions and make reasoned, logical decisions in the face of emotion, stress, and time pressure. For this reason, as a condition of his reinstatement we require Respondent to undergo an independent mental health evaluation and to initiate such treatment as recommended by the evaluator.

## V. *CONCLUSION*

Respondent's incompetent advice to Quispe not to appear at a pretrial conference, coupled with his failure to attend the same court hearing and his mishandling of the consequences of those decisions, violated Colo. RPC 1.1 and 8.4(d). Taking into account the mitigating and aggravating factors, in particular Respondent's prior disciplinary history, the Hearing Board concludes that Respondent should be suspended for six months,

with the requirement that he petition for reinstatement pursuant to C.R.C.P. 251.29(c).

## VI. *ORDER*

The Hearing Board therefore **ORDERS:**

1. **NORMAN B. BEECHER,** attorney registration number 12722, is **SUSPENDED FOR SIX MONTHS.** The **SUSPENSION SHALL** take effect only upon issuance of "Order and Notice of Suspension." [86]

2. Should he wish to resume the practice of law, Respondent **SHALL** petition for reinstatement pursuant to C.R.C.P. 251.29(c). As a condition of reinstatement, Respondent **SHALL** undergo an independent mental health examination and **SHALL** initiate such treatment as recommended by the evaluator.

3. The parties **SHALL** file any post-hearing motion or application for stay pending appeal with the Hearing Board **on or before Monday, May 12, 2014.** No extensions of time will be granted. If a party files a post-hearing motion or an application for stay pending appeal, any response thereto **SHALL** be filed within seven days, unless otherwise ordered by the PDJ.

4. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** submit a "Statement of Costs" within fourteen days from the date of this order. Respondent's response thereto, if any, **SHALL** be filed within seven days, unless otherwise ordered by the PDJ.

---

86. In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.